John W. Mills, III (CA Bar No. 149861)
jmills@joneswalker.com
JONES WALKER LLP
3455 Peachtree Road, NE, Suite 1400
Atlanta, GA  30326
Telephone: (404) 870-7517
Facsimile: (404) 870-7557

Mark A. Mintz (*pro hac vice* forthcoming)
mmintz@joneswalker.com
JONES WALKER LLP
201 St. Charles Ave, Ste 5100
New Orleans, LA 70170
Telephone: (504) 582-8368
Facsimile: (504) 589-8368

*Proposed Attorneys for Debtors and
Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

In re:

STORCENTRIC, INC., *et al.*,

Debtors.[1]

Case No. 22-50515

Chapter 11

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Date:
Time:
Place:
Judge:  Hon. M. Elaine Hammond

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: StorCentric, Inc. (6210); Nexsan Technologies Incorporated (5244); Nexsan Corporation (9778); Connected Data, Inc. (5504); Drobo, Inc. (2545); Retrospect, Inc. (0638); VS Acquisition Company, LLC.  The Debtors' business address is 1289 Anvilwood Avenue, Sunnyvale, CA 94089.

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned bankruptcy cases (the "Bankruptcy Cases"), hereby submit this motion (the "Motion"), for the entry of interim and final orders, pursuant to sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1 and 4001-1 of the Bankruptcy Local Rules for the Northern District of California (the "Bankruptcy Local Rules"), for authorization to obtain up to $5,000,000.00 of secured, superpriority post-petition financing on the terms detailed herein. The Debtors also seek an interim order approving the immediate borrowing and use of $1,500,000.00 of financing on the terms described herein to enable them to continue operating in the ordinary course of business between the Petition Date (defined below) and the final hearing on this Motion (the "Interim Period").

A proposed form of order granting the relief requested herein on an interim basis (the "Interim Order") is attached hereto as **Exhibit A**.

In support of this Motion, the Debtors submit the *Declaration of John Coughlan, Chief Financial Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), fully incorporated herein by reference,[2] the *Declaration of Adam Meislik in Support of Motion for Entry of Interim and Final Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and, (VI) Granting Related Relief* (the "Meislik Declaration"), and the accompanying memorandum of points and authorities set forth below.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings scribed to them in the First Day Declaration.

# TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTORY STATEMENT ...................................................................................1

II. CERTIFICATION ...................................................................................................10

I. PRELIMINARY STATEMENT ..................................................................................11

II. JURISDICTION AND VENUE ................................................................................11

III. BACKGROUND....................................................................................................12

IV. RELIEF REQUESTED..........................................................................................12

V. OVERVIEW OF PROPOSED DIP FACILITY .........................................................13

VI. STATEMENT OF SIGNIFICANT PROVISIONS ....................................................23

VII. DEBTORS' PRE-PETITION DEBT STRUCTURE .................................................23

VIII. BACKGROUND TO THE PROPOSED POST-PETITION FINANCING ...........................24

IX. BASIS FOR REQUESTED RELIEF.......................................................................25

X. EMERGENCY CONSIDERATION..........................................................................35

XI. WAIVER OF BANKRUPTCY RULE 6004 .............................................................35

XII. RESERVATION OF RIGHTS ...............................................................................35

XIII. NOTICE ..........................................................................................................36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anchor Sav. Bank SB v. Sky Valley. Inc.*,
  99 B.R. 117 (N.D. Ga. 1989)............................................................................31

*Czyzewski v. Jevic Holding Corp.*,
  137 S. Ct. 973 (2017).....................................................................................27

*In re Ames Dep't Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990).........................................................26, 27, 34

*In re Capitol Station 65, LLC*,
  No. 17- 23627-B-11, 2018 WL 333863,
  at *12 (Bankr. E.D. Cal. Jan. 8, 2018).....................................................................27

*In re Farmland Indus., Inc.*,
  294 B.R. 855 (Bankr. W.D. Mo. 2003) ....................................................................26

*In re Los Angeles Dodgers LLC*,
  457 B.R. 308 (Bankr. D. Del. 2011).......................................................................26

*In re Reading Tube Indus.*,
  72 B.R. 329 (Bankr. E.D. Pa. 1987) .....................................................................27

*In re Simasko Prod. Co.*,
  47 B.R. 444 (D. Colo. 1985)..............................................................................26

*In re Snowshoe Co.*,
  789 F.2d 1085 (4th Cir. 1986) ...........................................................................27

**Statutes**

11 U.S.C. § 364 ..................................................................................... *passim*
11 U.S.C. § 363 ..................................................................................... *passim*

**Rules**

FED. R. BANKR. P. 4001.............................................................................. *passim*

## I.

## INTRODUCTORY STATEMENT

The Debtors submit the following Introductory Statement according to the Court's *Guidelines for Cash Collateral and Financing Motions and Stipulations* (the "Guidelines"),[3] with respect to the multi-draw term loan credit facility (the "DIP Facility"), dated June 21, 2022, by and among the Debtors and Serene Investment Management, LLC (in such capacity, the "DIP Lender"), on the terms set for in **Exhibit 1** attached to the proposed Interim Order.[4]

| | |
|---|---|
| **Borrowers:** | StorCentric, Inc.; Nexsan Technologies Incorporated; Nexsan Corporation; Connected Data, Inc.; Drobo, Inc.; Retrospect, Inc.; VS Acquisition Company, LLC (collectively, the "Borrowers" or "Debtors"), each as joint and several obligors, and as debtors and debtors in possession in cases (collectively, the "Bankruptcy Case") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") on June 20, 2022 (the "Petition Date"). |
| **Guarantors:** | DIP Lender (defined below) reserves the right to request that each of the Debtors' non-debtor subsidiaries (including, but not limited to, any subsidiaries located outside of the United States) guarantee the DIP Obligations and grant liens on their assets to support the DIP Obligations as a condition precedent to the making of any advances at any time after the entry of the Interim DIP Order, which such condition can only be waived by the DIP Lender in its sole discretion. |
| **DIP Lender:** | Serene Investment Mangement, LLC ("DIP Lender") |
| **Facilities:** | A superpriority senior secured priming term loan facility (the "DIP Facility," and the term loans to be made thereunder, the "DIP Loans") in the maximum aggregate amount on the DIP Closing Date (as defined below) of $5,000,000.00 (the "DIP Facility Amount"). Funding of the DIP Loans will be available in drawings on each of the Interim DIP Closing Date (as defined below) and the DIP Closing Date (as defined below). |

---

[3] The summaries contained in this Introductory Statement are qualified in their entirety by the provisions of, *inter alia*, the DIP Facility and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

[4] Unless otherwise indicated, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the Meisler Declaration, or alternatively, the Interim Order.

| | | |
|---|---|---|
| **Availability:** | | Upon entry of the Interim Order, DIP Loans consisting of not less than $1,500,000.00 principal amount of the DIP Facility (the "Interim DIP Loans") will be requested by the Borrowers and funded by the DIP Lender on the Interim DIP Closing Date. |
| | | Upon entry of the Final Order (as defined below), DIP Loans will be requested by the Borrowers and funded by the DIP Lender on the DIP Closing Date. |
| | | Borrowers will request a draw no more than once per week, based on the budgeted cash requirements for the subsequent week ("Weekly DIP Draws") |
| | | The total of the Interim DIP Loans, and the Weekly DIP Draws will not exceed the DIP Facility Amount. |
| **DIP Financing Orders:** | | The Bankruptcy Court shall enter an interim order (the "Interim Order") and a final order (the "Final Order", and together with the Interim Order, the "DIP Financing Orders"), each in form and substance satisfactory to the DIP Lender in their sole and absolute discretion, which shall, among other things (i) authorize and approve the DIP Facility in the amounts and on the terms and conditions set forth herein, and (ii) grant the superpriority claims and liens and other liens described in the section *"Security and Priority"* below.  The Interim Order shall be entered by the Bankruptcy Court not later than two (2) business days after the Petition Date. The Final Order shall be entered by the Bankruptcy Court not later than thirty (30) calendar days after the date of entry of the Interim Order. The DIP Financing Orders shall not be vacated, reversed, modified, amended or stayed in any respect without the prior written consent of the DIP Lender. |
| **Maturity:** | | The DIP Loans shall mature upon the "Termination Date," which shall be the earliest of (a) the date that is six (6) months after the Petition Date, (b) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such period, (c) the consummation of a sale of the Borrowers, the direct or indirect owners of the Borrowers (including the Guarantors), or all or substantially all of the assets of the Borrowers, (d) the substantial consummation of a plan of reorganization or a plan of liquidation for any of the Loan Parties or any affiliated debtor in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to the DIP Facility in accordance with the DIP Financing Documents.  Upon the Termination Date, all obligations under the DIP Facility and the DIP Financing Documents, including principal, interest, fees, and expenses (if any) shall be due and payable. |
| **Interest:** | | Make Whole of $1 million or full DIP Facility Amount at Maturity or a sale closing. Make Whole will be in proportion to amounts actually |

| | | |
|---|---|---|
| | | funded. A default rate of $25,000 per month will apply. |
| | **Fees:** | Borrower shall be responsible for all fees, costs and expenses of DIP Lender including any and all expenses of DIP Lender's counsel, professional advisors, or in house administration and shall reimburse such amounts promptly upon demand. |
| | **Mandatory Prepayments:** | Mandatory prepayment of the DIP Loans, with accrued and unpaid interest, if any, shall be required with (a) 100% of the net cash proceeds received for the incurrence of indebtedness by the Loan Parties not permitted by the express written consent of the DIP Lender in their sole discretion and (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any DIP Collateral (defined below), subject to exceptions to be agreed upon. |
| | **Optional Prepayments:** | Upon notice of at least one (1) business day, the Borrowers may prepay the DIP Loans in full or in part, with accrued and unpaid interest (if any). |
| | **Security and Priority:** | The obligations of the Loan Parties under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times pursuant to 364(c)(1), 364(c)(2) and 364(d) of the Bankruptcy Code, be secured by a perfected, priming superpriority security interest and lien on the DIP Collateral, excluding any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents, and the proceeds thereof (collectively, "<u>Avoidance Actions</u>").

"<u>DIP Collateral</u>" means all assets and property of the Loan Parties currently owned or hereafter acquired, including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, trade names and other intellectual property and capital stock of subsidiaries, and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type, and excludes Avoidance Actions. |
| | **Carve-Out:** | The "<u>Carve-Out</u>" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, success fees, costs and expenses (the "<u>Professional Fees</u>") incurred by persons or firms ("<u>Professional Persons</u>") retained by the Debtors or the official committee of unsecured creditors appointed in the Bankruptcy Case (the "<u>Creditors' Committee</u>"), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other |

compensation orders entered by the Bankruptcy Court that are incurred (A) at any time before delivery to the Borrower of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget (as defined below), the Interim Order or Final Order; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $85,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account") in an amount not to exceed the amount budgeted for such Professional Persons in the Approve Budget, which account shall be used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors shall pay the amounts set forth in the Approved Budget for Professional Fees into the Carve-Out Account. Any shortfall in the Carve-Out Account shall be funded from the net proceeds of the Collateral resulting from a sale of the Collateral outside the ordinary course of business (which constitutes an event triggering mandatory prepayment of the DIP Loans), only after the DIP Loans have been repaid in full.

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization by the DIP Lender upon any DIP Collateral in accordance with the DIP Financing Documents; (d) paying any amount on account of any claims arising before the commencement of the Bankruptcy Case unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.

For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, the superpriority claims, and any and all other liens or claims existing pursuant to the DIP Facility, and may only be paid from the Carve-Out Account.

| | |
|---|---|
| **Purpose/Use of Proceeds:** | Amounts that may be made available under the DIP Facility shall be used by the Borrowers to fund costs of the Borrowers of administering the |

| | |
|---|---|
| | Bankruptcy Case, including up to an amount reasonably satisfactory to the DIP Lender for the fees and expenses of professional advisors retained by the Borrowers and their affiliated debtors in the Bankruptcy Cases (collectively, the "Debtor Group"), and for the general working capital of the Borrowers, *provided* that such amounts shall only be funded by the DIP Lender and allocated and spent by the Borrowers in accordance with the Approved Budget; and to pay the fees and expenses incurred by the Borrowers pursuant to the DIP Facility and the DIP Financing Documents. |
| **Approved Budget and Reporting Compliance:** | A budget with expense and cash flow projections for each of the Borrowers for the 13-week period beginning on the Petition Date, including details of any proposed changes in the terms and conditions of customer pricing, including discounts, rebates or other concessions, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Borrowers of any material variances, to be certified by a responsible officer of the Borrowers and approved in form and substance by the DIP Lender (once so approved, and subject to any update as may be approved by the DIP Lender, the "Approved Budget"). The Borrowers shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility, subject to such permitted variance approved by the DIP Lender in its sole discretion. <br><br> The Borrowers shall provide the DIP Lender monthly unaudited summary financial statements (i) for each of the Borrowers in a form satisfactory to the DIP Lender, and (ii) for the Debtor Group in the most detailed form as that provided to any creditor or party in interest (including a Creditors' Committee) in the Bankruptcy Case, and shall cause counsel for the Debtors in the Bankruptcy Case to provide copies of all material pleadings or other filings prepared on behalf of the Debtor Group not later than three (3) calendar days before their filing. |
| **Conditions Precedent to the Interim DIP Closing Date and the DIP Closing Date:** | The obligations of the DIP Lender (i) to make the Interim DIP Loans upon the closing thereof (the date of such closing, the "Interim DIP Closing Date") and (ii) to make the other DIP Loans (the date of such closing, the "DIP Closing Date") shall be subject to the satisfaction (or waiver) of customary conditions precedent, including: <br><br> (i)      The Petition Date shall have occurred, and each of the Loan Parties shall be a debtor and a debtor-in-possession in the Bankruptcy Case. The Interim Order shall have been entered within two (2) business days following the Petition Date. The Interim Order, all "first day orders" in the Bankruptcy Case, and (if applicable) the Final Order, in form and substance satisfactory to the DIP Lender, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed. |

| | | |
|---|---|---|
| | (ii) | No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case. |
| | (iii) | Immediately prior to, and after giving effect to, the making of the DIP Loans, there shall exist no default under the DIP Financing Documents, and the Termination Date shall not have occurred. |
| | (iv) | The representations and warranties of the Loan Parties in the DIP Financing Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, the funding or issuance of the DIP Loans. |
| | (v) | The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. |
| | (vi) | The making of the DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable. |
| | (vii) | The Borrowers shall have paid all fees and expenses payable pursuant to the DIP Financing Documents and incurred as of the Interim DIP Closing Date or the DIP Closing Date, as applicable. |
| **Representations and Warranties:** | The DIP Financing Documents shall contain representations and warranties that are usual and customary for facilities of this type, subject to the approval of the DIP Lender in their sole discretion, including, but not limited, to the following: (i) financial condition, (ii) no change, (iii) corporate existence, (iv) compliance with law, (v) corporate power, (vi) authorization, (vii) enforceable obligations, (viii) no legal bar, (ix) litigation, (x) no default, (xi) ownership of property, (xii) liens, (xiii) insurance, (xiv) intellectual property, (xv) taxes, (xvi) federal regulations, (xvii) labor matters, (xviii) ERISA, (xix) Investment Company Act, (xx) other regulations, (xxi) subsidiaries, (xxii) use of proceeds as set forth in the section *"Purpose/Use of Proceeds"* above, (xxiii) environmental matters, (xxiv) accuracy of information, (xxv) security documents, (xxvi) senior indebtedness, and (xxvii) anti-terrorism law. | |
| **Case Milestones:** | The DIP Financing Documents, including the Interim Order and the Final Order, shall require compliance with the following milestones in accordance with the applicable timing referred to below (or such later dates as approved by the DIP Lender in its sole discretion): | |
| | (i) | Not later than a date that is twenty-one 21 days following the |

| | | |
|---|---|---|
| | | Petition Date, the Debtor shall file with the Bankruptcy Court, a motion to approve bidding procedures with respect to a sale of the Borrowers or of all or substantially all of the Borrowers' assets ("<u>Bidding Procedures Motion</u>"). |
| | (ii) | Not later than a date that is forty-five (45) days following the Bidding Procedures Motion, the Bankruptcy Court shall enter an order approving the proposed bidding procedures (the "<u>Sale Procedures Order</u>"), which bidding procedures shall include an Allocation Requirement and which shall be reasonably satisfactory to the DIP Lender. |
| | (iii) | Not later than a date that is sixty (60) days following the Bidding Procedures Motion, the Loan Parties shall consummate the sale of the Borrowers or of all or substantially all of the Borrowers' assets pursuant to the Sale Procedures Order. |
| **Affirmative Covenants:** | | The DIP Financing Documents shall contain affirmative covenants usual and customary for facilities of this type, to be applicable to the Loan Parties and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Financing Documents, subject to the approval of the DIP Lender in its sole discretion, which shall include, but not be limited to, the following: (i) financial statements (including the financial disclosure required in the section *"Approved Budget and Reporting Compliance"* above), (ii) certificates; other information, (iii) payment of obligations, (iv) maintenance of existence; compliance, (v) maintenance of property; insurance, (vi) inspection of property; books and records; discussion, (vii) notices, (viii) environmental laws, (ix) additional collateral (x) security interests; further assurances, (xi) ERISA, (xii) use of proceeds, and (xiii) certain bankruptcy matters. |
| **Negative Covenants:** | | The DIP Financing Documents shall contain negative covenants usual and customary for facilities of this type, to be applicable to the Loan Parties and in each case with customary exceptions, qualifications and baskets to be agreed upon in the DIP Financing Documents, subject to the approval of the DIP Lender in its sole discretion, which include, but not be limited to, the following: (i) limitations on indebtedness, (ii) limitations on liens, (iii) limitations on fundamental changes, (iv) limitations on dispositions of property, (v) limitations on restricted payments, (vi) limitations on investments, (vii) limitations on prepayments and modifications of certain debt instruments or organization documents, (viii) limitations on transactions with affiliates, (ix) limitations on changes in fiscal periods and accounting changes, (x) limitations on negative pledge clauses, (xi) limitations on clauses restricting subsidiary distributions, (xii) limitations on lines of business, (xiii) limitations on material agreements, (xiv) limitations on capital expenditures, (xv) limitations on sale and leaseback transactions, (xvi) limitations on locations of collateral, and (xvii) certain bankruptcy matters. |

| | | |
|---|---|---|
| **Events of Default:** | | The DIP Financing Documents shall contain events of default, and where appropriate, grace periods and exceptions, usual and customary for financings of this type, subject to the approval of the DIP Lender in its sole discretion, which events of default (each, an "Event of Default") shall include, but not be limited to, the following: (i) failure to pay principal, interest, or any other amounts due and payable by the Borrowers at the Termination Date or as set forth in the DIP Financing Documents; (ii) breaches of representations, warranties and covenants; (iii) failure to meet any of the milestones set forth in the section *"Case Milestones"* above; (iv) reversals, stays or modifications of the Interim Order or the Final Order, (v) the entry of an order in the Bankruptcy Case seeking authority to obtain financing under section 364 of the Bankruptcy Code for which any of the Loan Parties are or may become liable (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; (vi) conversion or dismissal of the Bankruptcy Case, appointment of a trustee or examiner with extended powers, termination of the exclusivity period with regard to any member of the Debtor Group, filing of a plan of reorganization or plan of liquidation not acceptable to the DIP Lender, or any action by a member of the Debtor Group in furtherance of any of the foregoing (including a failure by the Debtor Group to contest actions by others); (vii) the entry of the Final Order shall not have occurred within thirty (30) days after the entry of the Interim Order ; and (viii) entry of an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code or senior secured status pursuant to section 364(c)(2) of the Bankruptcy Code senior to or *pari passu* with the claims of the DIP Lender Parties under the DIP Facility.<br><br>Upon the occurrence of an Event of Default, the DIP Lender may (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (iii) the termination of the DIP Facility and the DIP Financing Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the liens or the obligations under the DIP Facility and (y) upon the giving of five (5) business days' notice to the Loan Parties (the "Remedies Notice Period"), exercise all other rights and remedies provided for in the DIP Financing Documents and applicable law. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing. |
| **Waiver / Modification of** | | The automatic stay otherwise applicable to the DIP Lender is modified to the extent necessary to (i) effectuate the terms of the DIP Facility; (ii) |

| | | |
|---|---|---|
| the Automatic Stay: | exercise their respective rights and remedies with respect to the DIP Collateral (as applicable), subject to five (5) business days' prior written notice and a hearing; and (iii) upon the occurrence and continuation of an Event of Default, (a) declare the DIP Loans and all other obligations under the DIP Facility to be due and payable; (b) refuse to extend any further DIP Loans under the DIP Facility, and/or (c) terminate the use of cash collateral securing payment of any obligations under the DIP Facility or the DIP Financing Documents. | |
| Credit Bid: | The DIP Lender (upon entry of the Interim Order) will have the unqualified right, in accordance with the terms of the DIP Financing Documents, to credit bid up to the full amount of the outstanding obligations under the DIP Facility and the DIP Financing Documents (each such bid, a "<u>Credit Bid</u>"), in each case pursuant to section 363(k) of the Bankruptcy Code, in any sale or transfer of Collateral authorized by the Bankruptcy Court pursuant to section 363, 725, or 1123 of the Bankruptcy Code. | |
| Expenses and Indemnification: | The Borrowers shall pay or reimburse the DIP Lender for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of counsel to the DIP Lender Parties) in connection with (i) the preparation, negotiation and execution of the DIP Facility and the DIP Financing Documents; (ii) the funding of the DIP Loans; (iii) the creation, perfection or protection of the liens under the DIP Financing Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Financing Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Bankruptcy Case.

The Borrowers shall pay or reimburse the DIP Lender for all reasonable and documented out-of-pocket costs and expenses incurred (including reasonable and documented fees and expenses of counsel to the DIP Lender Parties in connection with (i) the enforcement of the DIP Financing Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated  by the DIP Financing Documents, including the Bankruptcy Case.

The Borrowers will indemnify and hold harmless the DIP Lender and its respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Financing Documents and the Borrowers' use of the financing provided thereunder.  The indemnification will survive and continue for the benefit of all such persons or entities. | |

| Governing Law: | Federal bankruptcy law and the laws of the State of California. |
|---|---|

## II.

## **CERTIFICATION**

The undersigned counsel for the Debtors has read the Motion. To the best of my knowledge, information, and belief, formed after reasonable inquiry, and except as identified herein, the terms and relief sought in the Motion are in conformity with the Court's Guidelines for Cash Collateral and Financing Motions and Stipulations. I understand and have advised the Debtors that the Court may grant appropriate relief under Bankruptcy Rule 9024 if the Court determines that a material element of the Motion was not adequately disclosed in the Introductory Statement.

Dated: June 21, 2022

JONES WALKER LLP

By: */s/ John W. Mills*
John W. Mills
Mark A. Mintz

*Proposed Attorneys for Debtors and Debtors in Possession*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## PRELIMINARY STATEMENT

As more fully set forth below, for over twenty years, the Debtors have developed software and security systems to mitigate cybersecurity threats to ensure data is not compromised. The Debtors have been operating at a loss for some time, and have been sustained with ongoing pre-petition loan advances and forbearance from their pre-petition secured lender over the last year.

Following good faith, arms-length negotiations, the Debtors agreed to the terms of the DIP Facility with the DIP Lender Parties to provide the funding that their estates require to maintain operations and provide a sufficient runway to consummate a going concern sale and ultimately confirmation of a plan of reorganization. The Debtors are confident that, as a result of their pre-petition efforts, the proposed DIP Facility is the only realistic funding option available under the circumstances. Absent the DIP Facility, the Debtors would no longer be able to operate as going concerns. The Debtors therefore believe that approval of the DIP Facility reflects the exercise of the Debtors' sound business judgment.

Without the DIP Facility in place, the Debtors lack sufficient capital to continue operations. Accordingly, it is imperative that the DIP Facility be immediately approved to maximize the value of the Debtors' estates as going concerns for the financial benefit of the Debtors' economic stakeholders.

## II.

## JURISDICTION AND VENUE

The United States Bankruptcy Court for the Northern District of California (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Bankruptcy Local Rule 5011-1(a). The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The legal bases for the relief requested herein are sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Rules 2002-1 and 4001-1 of the Bankruptcy Local Rules.

**III.**

**BACKGROUND**

On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Bankruptcy Cases, and no committees have been appointed or designated.

**IV.**

**RELIEF REQUESTED**

By this Motion, the Debtors respectfully request entry of the Interim Order, substantially in the form of **Exhibit A**, and the granting of, among other things, the following relief:

i. authorization for the Debtors to obtain post-petition loans, advances and other financial accommodations (the "DIP Loans") in an amount up to $1,500,000.00 on an interim basis for a period (the "Interim Period") through and including the date of the Final Hearing (as defined below) from Serene Investment Management, LLC (in such capacity, the "DIP Lender"), in accordance with all of the terms and conditions set forth in the DIP Agreement (as defined below), and in accordance with this Order, secured by first priority security interests in and liens upon all of the DIP Collateral (as defined below) pursuant to sections 364(c) and 364(d) of the Bankruptcy Code;

ii. authorization for the Debtors to enter into, be bound by, and perform under a debtor in possession credit facility (the "DIP Facility"), pursuant to an agreement dated as of June 21, 2022, by and among the Debtors and the DIP Lender, which agreement is attached as **Exhibit 1** to the proposed Interim Order(the "DIP Agreement");

iii. modification of the automatic stay to the extent hereinafter set forth;

iv. granting to the DIP Lender first priority DIP Liens (as defined below) on all of the DIP Collateral (as defined below) not subject to a lien to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Agreement, as applicable, and this Interim Order and the Final Order (as defined below), as applicable

(collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below), pursuant to section 364(c)(2) of the Bankruptcy Code;

v.  granting to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Facility and all DIP Obligations, subject only to prior payment of the Carve-Out and senior to the existing liens and security interests in favor of UMB Bank, National Association (in such capacity, the "Prepetition Lender"), pursuant to section 364(d) of the Bankruptcy Code;

vi.  granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all amount advanced to the Debtors under the DIP Agreement;

vii.  finding that the Prepetition Lender is adequately protected pursuant to section 364(d)(1)(B) of the Bankruptcy Code, because the value of its prepetition collateral far exceeds the amount of the DIP Loans to be advanced to the Debtors on an interim basis;

viii.  authorization for the Debtors to use the DIP Collateral (including Cash Collateral) (as defined below) in accordance with the Budget (as defined below);

ix.  authorization for the Debtors to use the proceeds of DIP Loans, subject to the terms, restrictions, and other conditions of the DIP Agreement and this Interim Order, to (a) upon entry of this Interim Order, accrue fees and expenses related to the DIP Agreement and the Cases, and (b) fund working capital in the ordinary course of the business of the Debtors and other general corporate purposes, in each case, to the extent set forth in the Approved Budget and permitted under the DIP Agreement;

x.  setting of a Final Hearing (as defined below) on the Motion; and

xi.  Waiving, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

## V.

## OVERVIEW OF PROPOSED DIP FACILITY

The following chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B).[5]

---

[5] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including, without limitation, the DIP Note and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| Bankruptcy Rule | Summary of Material Terms/Significant Provisions | Reference |
|---|---|---|
| **Parties to the DIP Note**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Borrowers: StorCentric, Inc.; Nexsan Technologies Incorporated; Nexsan Corporation; Connected Data, Inc.; Drobo, Inc.; Retrospect, Inc.; VS Acquisition Company, LLC (collectively, the "Borrowers" or "Debtors"), each as joint and several obligors, and as debtors and debtors in possession in cases (collectively, the "Bankruptcy Case") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court") on June 20, 2022 (the "Petition Date").<br><br>DIP Lender: Serene Investment Management, LLC. | DIP Facility p. 1. |
| **Term**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The DIP Loans shall mature upon the "Termination Date," which shall be the earliest of (a) the date that is six (6) months after the Petition Date, (b) thirty (30) days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such period, (c) the consummation of a sale of the Borrowers, the direct or indirect owners of the Borrowers (including the Guarantors), or all or substantially all of the assets of the Borrowers, (d) the substantial consummation of a plan of reorganization or a plan of liquidation for any of the Loan Parties or any affiliated debtor in the Bankruptcy Case that is confirmed pursuant to an order entered by the Bankruptcy Court, and (e) the acceleration of the DIP Loans and the termination of the commitment with respect to the DIP Facility in accordance with the DIP Financing Documents. Upon the Termination Date, all obligations under the DIP Facility and the DIP Financing Documents, including principal, interest, fees, and expenses (if any) shall be due and payable. | DIP Facility, p. 2. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | A superpriority senior secured priming term loan facility in the maximum aggregate amount on the DIP Closing Date of $5,000,000.00. | DIP Facility, pp. 1-2. |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Make Whole of $1 million or full DIP Facility Amount at Maturity or a sale closing. Make Whole will be in proportion to amounts actually funded. A default rate of $25,000 per month will apply. | DIP Facility, p. 3. |
| **Conditions to** | The obligations of the DIP Lender (i) to make the | DIP Facility |

| | | | |
|---|---|---|---|
| **Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Interim DIP Loans upon the closing thereof (the date of such closing, the "<u>Interim DIP Closing Date</u>") and (ii) to make the other DIP Loans (the date of such closing, the "<u>DIP Closing Date</u>") shall be subject to the satisfaction (or waiver) of customary conditions precedent, including: | p. 6. |

(i)      The Petition Date shall have occurred, and each of the Loan Parties shall be a debtor and a debtor-in-possession in the Bankruptcy Case. The Interim Order shall have been entered within two (2) business days following the Petition Date. The Interim Order, all "first day orders" in the Bankruptcy Case, and (if applicable) the Final Order, in form and substance satisfactory to the DIP Lender Parties, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed.

(ii)     No trustee or examiner having expanded powers shall have been appointed with respect to the Bankruptcy Case.

(iii)    Immediately prior to, and after giving effect to, the making of the DIP Loans, there shall exist no default under the DIP Financing Documents, and the Termination Date shall not have occurred.

(iv)    The representations and warranties of the Loan Parties in the DIP Financing Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, the funding or issuance of the DIP Loans.

(v)     The making of the DIP Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(vi)    The making of the DIP Loans shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount

| | | |
|---|---|---|
| | authorized by the Interim Order or the Final Order, as applicable.<br><br>(vii)    The Borrowers shall have paid all fees and expenses payable pursuant to the DIP Financing Documents and incurred as of the Interim DIP Closing Date or the DIP Closing Date, as applicable. | |
| **Collateral and Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | The obligations of the Loan Parties under the DIP Facility shall, subject to the Carve-Out (as defined below), at all times pursuant to 364(c)(1), 364(c)(2) and 364(d) of the Bankruptcy Code, be secured by a perfected, priming superpriority security interest and lien on the DIP Collateral, excluding any avoidance actions brought pursuant to chapter 5 of the Bankruptcy Code or applicable state law equivalents, and the proceeds thereof (collectively, "Avoidance Actions").<br><br>"DIP Collateral" means all assets and property of the Loan Parties currently owned or hereafter acquired, including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, trade names and other intellectual property and capital stock of subsidiaries, and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type, and excludes Avoidance Actions. | DIP Facility, pp. 3-4. |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Amounts that may be made available under the DIP Facility shall be used by the Borrowers to fund costs of the Borrowers of administering the Bankruptcy Case, including up to an amount reasonably satisfactory to the DIP Lender for the fees and expenses of professional advisors retained by the Borrowers and their affiliated debtors in the Bankruptcy Case, and for the general working capital of the Borrowers, *provided* that such amounts shall only be funded by the DIP Lender and allocated and spent by the Borrowers in accordance with the Approved Budget (described below); and to pay the fees and expenses incurred by the Borrowers pursuant to the DIP Facility and the DIP Financing Documents. | DIP Facility, pp. 5. |

| | | |
|---|---|---|
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | DIP Lendert | DIP Facility, pp. 3-4. |
| **Fees/Costs/Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Borrower shall be responsible for all fees, costs and expenses of Lender including any and all expenses of Lender's counsel, professional advisors, or in house administration and shall reimburse such amounts promptly upon demand. | DIP Facility, p. 3. |
| **Payments**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Mandatory prepayment of the DIP Loans, with accrued and unpaid interest, if any, shall be required with (a) 100% of the net cash proceeds received for the incurrence of indebtedness by the Loan Parties not permitted by the express written consent of the DIP Lender in their sole discretion and (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any DIP Collateral, subject to exceptions to be agreed upon.<br><br>Upon notice of at least one (1) business day, the Borrowers may prepay the DIP Loans in full or in part, with accrued and unpaid interest (if any). | DIP Facility, p. 3. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B) | A budget with expense and cash flow projections for each of the Borrowers for the 13-week period beginning on the Petition Date, including details of any proposed changes in the terms and conditions of customer pricing, including discounts, rebates or other concessions, to be updated every four (4) weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Borrowers of any material variances, to be certified by a responsible officer of the Borrowers and approved in form and substance by the DIP Lender ("Approved Budget"). The Borrowers shall be required to comply with such Approved Budget in all material respects for purposes of the DIP Facility, subject to such permitted variance approved by the DIP Lender in their sole discretion. | DIP Facility p. 5. |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Borrowers shall provide the DIP Lender monthly unaudited summary financial statements (i) for each of the Borrowers in a form satisfactory to the DIP Lender, and (ii) for the Debtor Group in the most detailed form as that provided to any creditor or party in interest | DIP Facility, p. 5. |

| | | (including a Creditors' Committee) in the Bankruptcy Case, and shall cause counsel for the Debtors in the Bankruptcy Case to provide copies of all material pleadings or other filings prepared on behalf of the Debtor Group not later than three (3) calendar days before their filing. | |
|---|---|---|---|
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B) | | None. However, material variances in the Approved Budget may be allowed with the approval of the DIP Lender. | DIP Facility, p. 5. |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | | The DIP Financing Documents, including the Interim Order and the Final Order, shall require compliance with the following milestones in accordance with the applicable timing referred to below (or such later dates as approved by the DIP Lender in their sole discretion):<br><br>(i)    Not later than a date that is twenty-one (21) days following the Petition Date, the Debtor shall file with the Bankruptcy Court, a motion to approve bidding procedures with respect to a sale of the Borrowers or of all or substantially all of the Borrowers' assets ("Bidding Procedures Motion").<br><br>(ii)    Not later than a date that is forty-five (45) days following the Bidding Procedures Motion, the Bankruptcy Court shall enter an order approving the proposed bidding procedures (the "Sale Procedures Order"), which bidding procedures shall include an Allocation Requirement and which shall be reasonably satisfactory to the DIP Lender.<br><br>(iii)    Not later than a date that is sixty ( days following the Bidding Procedures Motion, the Loan Parties shall consummate the sale of the Borrowers or of all or substantially all of the Borrowers' assets pursuant to the Sale Procedures Order. | DIP Facility, p. 7. |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(c)(1)(B) | | The "Carve-Out" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $10,000 incurred by a | DIP Facility, pp. 4-5. |

trustee under section 726(b) of the Bankruptcy Code (which is included in the notice set forth in (iii) below); and (iii) allowed and unpaid claims for unpaid fees, success fees, costs and expenses (the "Professional Fees") incurred by persons or firms ("Professional Persons") retained by the Debtors or the official committee of unsecured creditors appointed in the Bankruptcy Case (the "Creditors' Committee"), if any, whose retention is approved by the Bankruptcy Court pursuant to sections 327, 328 or 363 and 1103 of the Bankruptcy Code, subject to the terms of the Approved Budget, the Interim Order, the Final Order and any other interim or other compensation orders entered by the Bankruptcy Court that are incurred (A) at any time before delivery to the Borrower of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to the delivery of a Carve-Out Trigger Notice, subject to any limits imposed by the Approved Budget (as defined below), the Interim Order or Final Order; and (B) after the occurrence and during the continuance of an Event of Default and delivery of written notice (the "Carve-Out Trigger Notice") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $85,000; *provided*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds. The Carve-Out may be funded to an administrative reserve account (the "Carve-Out Account") in an amount not to exceed the amount budgeted for such Professional Persons in the Approve Budget, which account shall be used to pay Professional Fees and any unpaid fees to the United States Trustee. As cash flow permits, and assuming no issuance of a Carve-Out Trigger Notice, the Debtors shall pay the amounts set forth in the Approved Budget for Professional Fees into the Carve-Out Account. Any shortfall in the Carve-Out Account shall be funded from the net proceeds of the Collateral resulting from a sale of the Collateral outside the ordinary course of business (which constitutes an event triggering mandatory prepayment of the DIP Loans), only after the DIP Loans have been repaid in full.

| | | Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lender's assertion, enforcement or realization by the DIP Lender upon any DIP Collateral in accordance with the DIP Financing Documents; (d) paying any amount on account of any claims arising before the commencement of the Bankruptcy Case unless such payments are approved by an order of the Bankruptcy Court; or (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees.<br><br>For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims securing the DIP Loans, any adequate protection liens, if any, the superpriority claims, and any and all other liens or claims existing pursuant to the DIP Facility, and may only be paid from the Carve-Out Account. | |
|---|---|---|---|
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(1)(B) | There is no challenge period. However, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or any of the DIP Lender; (b) attempts to modify any of the rights granted to the DIP Lender; (c) attempts to prevent, hinder or otherwise delay any of the DIP Lender's assertion, enforcement or realization by the DIP Lender upon any DIP Collateral in accordance with the DIP Financing Documents. | DIP Facility, pp. 4-5. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) | No adequate protection for pre-petition secured lender, UMB, has been negotiated. Prepetition is over secured. | |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Financing Documents shall contain events of default, and where appropriate, grace periods and exceptions, usual and customary for financings of this type, subject to the approval of the DIP Lender in their | DIP Facility, p. 8. |

sole discretion, which events of default (each, an "Event of Default") shall include, but not be limited to, the following: (i) failure to pay principal, interest, or any other amounts due and payable by the Borrowers at the Termination Date or as set forth in the DIP Financing Documents; (ii) breaches of representations, warranties and covenants; (iii) failure to meet any of the milestones set forth in the section *"Case Milestones"* above; (iv) reversals, stays or modifications of the Interim Order or the Final Order, (v) the entry of an order in the Bankruptcy Case seeking authority to obtain financing under section 364 of the Bankruptcy Code for which any of the Loan Parties are or may become liable (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof; (vi) conversion or dismissal of the Bankruptcy Case, appointment of a trustee or examiner with extended powers, termination of the exclusivity period with regard to any member of the Debtor Group, filing of a plan of reorganization or plan of liquidation not acceptable to the DIP Lender, or any action by a member of the Debtor Group in furtherance of any of the foregoing (including a failure by the Debtor Group to contest actions by others); (vii) the entry of the Final Order shall not have occurred within thirty (30) days after the entry of the Interim Order ; and (viii) entry of an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Bankruptcy Case pursuant to section 364(c)(1) of the Bankruptcy Code or senior secured status pursuant to section 364(c)(2) of the Bankruptcy Code senior to or *pari passu* with the claims of the DIP Lender Parties under the DIP Facility.

Upon the occurrence of an Event of Default, the DIP Lender may (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Loan Parties, and (iii) the termination of the DIP Facility and the DIP Financing Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the liens or the obligations under the DIP Facility and (y) upon the giving of five (5) business days' notice to

| | | the Loan Parties (the "Remedies Notice Period"), exercise all other rights and remedies provided for in the DIP Financing Documents and applicable law. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing. | |
|---|---|---|---|
| **Waiver/Modification of Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay otherwise applicable to the DIP Lender is modified to the extent necessary to (i) effectuate the terms of the DIP Facility; (ii) exercise their respective rights and remedies with respect to the DIP Collateral (as applicable), subject to five (5) business days' prior written notice and a hearing; and (iii) upon the occurrence and continuation of an Event of Default, (a) declare the DIP Loans and all other obligations under the DIP Facility to be due and payable; (b) refuse to extend any further DIP Loans under the DIP Facility, and/or (c) terminate the use of cash collateral securing payment of any obligations under the DIP Facility or the DIP Financing Documents. | DIP Facility, pp. 8-9 |
| **Waiver/Modification of Applicability of Non-Bankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | None. | |
| **Release**<br><br>Bankruptcy Rule 4001(c)(1)(B)(viii) | There are no releases of the DIP Lender. | |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrowers will indemnify and hold harmless the DIP Lender and its respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives from and against all losses, liabilities (including coverage of environmental liabilities), claims, damages or other expenses arising out of or relating to the DIP Financing Documents and the Borrowers' use of the financing provided thereunder. The indemnification will survive and continue for the benefit of all such persons or entities. | DIP Facility, p. 9. |
| **Section 506(c) Waiver** | There is no waiver of 11 U.S.C. §506(c). | |

| | | |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(x) | | |
| **Stipulation as to Prepetition First Lien Debt**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii) | There is no stipulation regarding pre-petition first lien debt. | |

## VI.

## STATEMENT OF SIGNIFICANT PROVISIONS

The DIP Facility does not include provisions not ordinarily approved by this Court based upon the Court's Guidelines.

## VII.

## DEBTORS' PRE-PETITION DEBT STRUCTURE

StorCentric, Inc. ("StorCentric") is the issuer of the *Fixed Rate Senior Notes, Series 2020-3 (Collateralized Loan Insurance Program)* (the "Series 2020-3 Notes") in the aggregate principal amount of $25,000,000 under and pursuant to a Trust Indenture, dated as of February 1, 2020 (the "Indenture") between StorCentric and UMB Bank, National Association, as trustee ("UMB Bank, N.A." or "Trustee"). The proceeds of the Series 2020-3 Notes are used by the Trustee, in the capacity of disbursing agent (the "Disbursing Agent") to make to StorCentric, Drobo, Inc., Nexsan Corporation, and Retrospect, Inc. (collectively, the "Co-Obligors"), a disbursement under and pursuant to a Proceeds Disbursing and Security Agreement by and among the Disbursing Agent, the Co-Obligors, and Newlight Capital LLC, as servicer (the "Servicer"), dated as of February 1, 2020 (the "Proceeds Disbursing Agreement"). Proceeds of the disbursement are used by the Co-Obligors to fund certain of their working capital needs and general corporate purposes, including the repayment of certain existing obligations.

The payments of principal and interest on the Series 2020-3 Notes are secured by the Trust Estate, as such term is defined in the Trust Indenture, dated as of February 1, 2020 (the

"Indenture").[6] Importantly, Peleus Insurance Company issued a Lender Collateral Residual Value Insurance Policy (the "Insurance Policy") to the Trustee to collateralize the Co-Obligors' payments under the Proceeds Disbursing Agreement. The Insurance Policy is equal to the initial principal amount of the Series 2020-3 Notes, and the Insurance Policy expires February 15, 2023.[7]

## VIII.

## BACKGROUND TO THE PROPOSED POST-PETITION FINANCING

The Debtors urgently require financing under the proposed DIP Facility in order to continue to operate their capital-intensive business and to fund these Bankruptcy Cases. Without the relief requested in the DIP Financing Motion, the Debtors will not have sufficient liquidity to pay utility providers, insurers, satisfy payroll obligations, and make any other payments that are essential or appropriate for the continued management, operation, and preservation of the Debtors' business and

---

[6] As defined in the Indenture, the following assets constitute the Trust Estate:

(a) the Proceeds Disbursing Agreement, including all Co-Obligor Payments and other amounts payable to the Trustee under the Proceeds Disbursing Agreement . . . and including the security interest in all funds and accounts granted by the Co-Obligors to the Servicer for the benefit of the Trustee pursuant to the Proceeds Disbursing Agreement, including all amounts therein pending disbursement;

(b) to the extent not included in (a), the security interest in the assets, including intellectual property assets, of the Co-Obligors pledged to the Servicer as collateral agent for the Trustee under the Proceeds Disbursing Agreement;

(c) the Insurance Policy, including all Insurance Payments made by the Insurer under the Insurance Policy to the extent that other amounts are not available to make the debt service payments due on the Series 2020-3 Notes;

(d) all of the proceeds of the foregoing, including without limitation investments thereof;

(e) amounts on deposit in the Payment Reserve Fund (as defined in the Indenture), to the extent needed to cover a shortfall in Co-Obligor Payments made by the Co-Obligors;

(f) amounts held in all other Funds established in the Indenture and held by the Trustee in connection with the Series 2020-3 Notes; and

(g) all other property of every name and nature from time to time by delivery or by writing mortgaged, pledged, delivered or hypothecated as and for additional security on the Series 2020-3 Notes by the Co-Obligors or by anyone on their behalf or with their written consent in favor of the Trustee.

[7] A full description of the Debtors capital structure can be found in the First Day Motion.

assets during these chapter 11 cases. *See* Meislik Declaration at ¶ 12.

Further, absent immediate access to the funds available from the DIP Facilitiy and the Debtors' continued use of Cash Collateral, as well as the cooperation of key business partners at this critical early stage, the Debtors could face a value destructive interruption to their businesses and, simultaneously, eliminate their best chance for negotiating and consummating a comprehensive and orderly restructuring, to the detriment of all stakeholders. *Id.* at 13. Access to greater liquidity pursuant to the DIP Facility will send a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors will have sufficient liquidity to maintain ordinary course operations and meet their financial commitments throughout the course of the Bankruptcy Cases. As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and use of Cash Collateral to operate their businesses, preserve value, and avoid irreparable harm pending the Final Hearing. *Id.* at ¶¶14-23.

**IX.**

**BASIS FOR REQUESTED RELIEF**

**A.**     **The Debtors Should Be Authorized to Obtain Post-petition Financing.**

The Debtors request authorization under sections 364(c)(1) and (d)(1) of the Bankruptcy Code to grant the DIP Lender the following protections: (a) superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code; and (b) first priority liens on the DIP Collateral, subject to the Carve-Out Expenses, pursuant to section 364(d)(1) of the Bankruptcy Code. The Debtors have satisfied the requirements to obtain credit on these terms.

**1.**     **The Debtors Have Satisfied Their Burden Under 11 U.S.C. § 364(c)(1).**

In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court may authorize the obtaining of credit or the incurring of debt "with priority over any and all administrative expenses."[8] Courts evaluating requests for financing under section 364(c) of the Bankruptcy Code consider whether certain factors are met, including: (1) the proposed

---

[8] 11 U.S.C. § 364(c)(1).

financing is an exercise of the debtor's sound and reasonable business judgment; (2) the financing agreement was negotiated in good faith and at arms' length; (3) no alternative financing is available on any other basis; (4) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the borrower and the proposed lender; (5) the financing is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the preservation of their estates; and (6) the financing is in the best interests of the estate and its creditors.[9] Each of these factors is satisfied here.

### a.    The DIP Facility Reflects the Debtors' Sound Business Judgment.

In evaluating proposed DIP financing under section 364(c) of the Bankruptcy Code, courts generally defer to the business judgment of the debtor.[10] Courts presume that debtors make financing decisions "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."[11] Courts will not "second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving of the decision."[12]

Here, the Debtors have exercised the utmost level of care in selecting and entering into the DIP Facility. The Debtors engaged in extensive efforts pre-petition to obtain financing to continue operations during their marketing process and reorganization. Indeed, without financing, the Debtors will not have the liquidity necessary to continue to operate until a going concern sale can be approved by this Court and consummated. This would destroy that value of the Debtors for their creditors and other stakeholders. Given their immediate need for financing, and given that the DIP Facility is the only realistic financing option available to the Debtors after searching for alternatives, the Debtors

---

[9] *See In re Gardens Reg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146, at *4 (Bankr. C.D. Cal. July 28, 2017) (approving post-petition financing under § 364(c) based on these factors); *In re Sterling Mining Co.*, No. 09-20178-TLM, 2009 WL 2514167, at *3 (Bankr. D. Idaho Aug. 14, 2009); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 879–81 (Bankr. W.D. Mo. 2003) (discussing factors applied by bankruptcy courts across jurisdictions).

[10] *See In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *10–11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

[11] *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *see also In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("The discretion to act with regard to business planning activities is at the heart of the debtor's power.").

[12] *In re Los Angeles Dodgers LLC*, 457 B.R. at 313; *see also In re Simasko Prod. Co.*, 47 B.R. at 449 ("business judgments should be left to the board room and not to this Court").

submit that the decision to enter into the DIP Facility is the product of their sound business judgment.

**b.**     ***The DIP Facility (1) Was Negotiated in Good Faith and at Arms' Length, (2) Its Terms Are Fair, Reasonable, and Adequate, and (3) The Debtors Could Not Obtain Credit Available On More Favorable Terms.***

A debtor is not required to seek alternative financing from every possible lender before it may grant administrative expense claims or incur secured debt.[13] Rather, the debtor need only demonstrate that it made a "reasonable effort" to obtain unsecured credit from other lenders.[14] Similarly, the "roll-up" of pre-petition debt is a common feature in debtor in possession financing arrangements, and courts generally approve such repayment in a variety of cases.[15]

The Debtors engaged in an extensive process to identify potential lenders and obtain the most favorable post-petition financing available. However, the Debtors' and their professionals' efforts to identify potential financing sources resulted in the identification of only one realistic financing provider—the DIP Lenders. Notwithstanding the fact that the DIP Lenders were the only parties willing to provide post-petition financing to the Debtors, the Debtors and their professionals were able to meaningfully negotiate the terms of the DIP Facility in good faith and at arms' length.

In this regard, the Debtors requested the approval of the Pre-Petition Draw from the DIP Facility due to liquidity needs relating to the payment of employees and professionals immediately prior to the filing of these chapter 11 cases.  The DIP Lenders agreed to permit the Pre-Petition Draw

---

[13] *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (more favorable credit unavailable where debtor contacted lenders in the "immediate geographic area" and they would not extend unsecured credit); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987).

[14] *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (citing cases); *In re Capitol Station 65, LLC*, No. 17- 23627-B-11, 2018 WL 333863, at *12 (Bankr. E.D. Cal. Jan. 8, 2018).

[15] *See, e.g., In re Veterinary Care, Inc.*, Case No. 19-35736 (Bankr. S.D. Tex. Feb. 12, 2020) [Docket No. 184] (authorizing roll-up of approximately $10.3 million in pre-petition debt as part of a $17 million debtor in possession financing pursuant to final order); *In re Channel Techs. Grp., LLC*, Case No. 16-11912 (Bankr. C.D. Cal. Nov. 9, 2016) [Docket No. 110] (authorizing roll-up of approximately $2.8 million in pre-petition debt as part of a $5 million debtor in possession financing, pursuant to final order); *In re Freedom Commc'ns, Inc.*, Case No. 15-15311 (Bankr. C.D. Cal. Dec. 16, 2015) [Docket No. 223] (authorizing roll-up of approximately $17.2 million in pre-petition debt for a $4.5 million new money loan pursuant to final order); *In re Appleseed's Intermediate Holdings LLC*, Case No. 11-10160 (Bankr. D. Del. Jan. 20, 2011) [Docket No. 34] (authorizing roll-up of approximately $48 million in pre-petition debt as part of $140 million debtor in possession financing pursuant to interim order); *In re Source Interlink Cos. Inc.*, Case No. 09-11424 (Bankr. D. Del. Apr. 29, 2009) [Docket No. 61] (authorizing roll-up of approximately $149 million in pre-petition debt as part of $385 million debtor in possession financing pursuant to interim order); *see also Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (recognizing in dicta that courts often approve "roll-ups" in first-day financing motions).

with the understanding the Debtors would request a "roll-up" of the Pre-Petition Draw into the DIP Facility. Importantly, the Pre-Petition Draw enabled the Debtors' to continue as a going concern and file these chapter 11 cases. Under the circumstances, the Debtors submit that the "roll-up" of the Pre-Petition Draw is appropriate.

Indeed, provisions similar to the enumerated terms at issue here are frequently approved in this district, and in large chapter 11 cases elsewhere, as an inducement for pre-petition secured lenders to provide post-petition financing.[16] Here, however, the DIP Lenders are not pre-petition secured lenders. For the foregoing reasons, the Debtors submit that the DIP Facility was negotiated at arms' length and in good faith, that the terms are fair, reasonable, and adequate, and that the DIP Facility represents the best financing available to the Debtors under the circumstances.

### c. *The DIP Facility (1) Is Necessary, Essential, and Appropriate for the Continued Operation of the Debtors' Business and the Preservation of their Estates and (2) is in the Best Interests of the Estates and their Creditors.*

As set forth above, the DIP Facility is necessary for the continued operation of the Debtors' business and the preservation of their estates. There can be no doubt that without sufficient financing, the Debtors would lack sufficient liquidity to continue operating pending a sale of their assets. Accordingly, the DIP Facility preserves the Debtors' operations and is in the best interests of the estates and their stakeholders.

### 2. The Debtors Have Satisfied Their Burden Under 11 U.S.C. § 364(d)(1).

Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."[17] Put differently, the proposed DIP Facility may only be granted under section 364(d)(1)

---

[16] *See, e.g., In Blue Earth, Inc.* Case No. 16-30296 (Bankr. N.D. Cal. Apr. 29, 2016) [Docket No. 116]; *In re Newzoom, Inc.*, Case No. 15-31141 (Bankr. N.D. Cal. Oct. 15, 2015) [Docket No. 153]; *In re Rdio, Inc.*, Case No. 15-31430 (Bankr. N.D. Cal. Dec. 10, 2015) [Docket No. 122]; *see also e.g., In re Toys "R" Us, Inc.*, Case No. 17-34665 (Bankr. E.D. Va. Sep. 20, 2017) [Docket No. 98].

[17] 11 U.S.C. § 364(d).

of the Bankruptcy Code if the Debtors are unable to obtain credit otherwise and the holders of the liens on the property on which the priming lien is to be granted are adequately protected.

### a. The Debtors are Unable to Obtain Credit Otherwise.

The Debtors believe that the DIP Facility, given the precipitous nature of the bankruptcy filing, represents the best, if not only source, of post-petition financing available to it at this time. Here, no party that the Debtors' advisors contacted as part of the above-described process was interested in providing, or willing to provide, post-petition financing to the Debtors on an unsecured basis. Indeed, no constituency was willing to provide post-petition financing on anything other than a priming basis with respect to all of the Debtors' assets. Therefore, the DIP Facility's structure is appropriate in light of the Debtors' financing needs and the lack of viable non-priming debtor-in-possession financing alternatives.

Moreover, the terms of the DIP Facility are fair and reasonable, and the proceeds thereof will greatly benefit the estates and will enhance the value of the Debtor's assets, including the value of the DIP Collateral. Without access to the DIP Facility proceeds, the Debtors would be unable to continue business operations and would be forced to liquidate, resulting in a reduction in the value of the DIP Collateral to just a fraction of the value if the Debtors continue as going concerns.

### b. The Pre-petition Lender is Adequately Protected.

"The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests." *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Certainly, the Debtors' access to the proceeds of the DIP Facility (along with the use of Cash Collateral) is absolutely necessary to permit the Debtors to continue operating. Without access to such funds, the Debtors would be forced to liquidate, which would result in a substantial loss of value of the Debtors' assets.

Numerous courts have found that use of proceeds of a priming DIP loan that preserve and enhance the going concern adequately protects the pre-petition lender's interests. *See, e.g., In re Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008) (where the Court authorized post-petition financing on a superpriority, secured, priming basis

pursuant to Section 364(d) after being satisfied that "the best way to maximize the value of Debtors' assets [wa]s to maintain the Debtors' going concern value."); *In re New World Pasta Co.*, No. 04-02817, 2004 Bankr. LEXIS 2638 (Bankr. M.D. Penn. July 19, 2004) (where the bankruptcy court granted debtors' request to obtain necessary financing with priming liens and also to use cash collateral, as these were of critical importance to the preservation and maintenance of debtors' going concern value and would enhance prospects for a successful reorganization."). Here, the interests of the pre-petition lender are adequately protected *through the availability and use of the DIP Facility proceeds*, which will preserve and enhance the going concern value of the businesses, and through the granting of superpriority administrative expense claims.

The pre-petition secured lender, UMB, is owed approximately $25 million. However, the value of its collateral is between $35 and $70 million. Consequently, UMB it is oversecured and adequately protected from the proposed priming of up to $5 million.

Moreover, the pre-petition lender is adequately protected by the Insurance Policy issued in connection with the Series 2020-3 Notes. To the extent the payments under the Series 2020-3 Notes are not made, the Trustee can assert a claim under the Insurance Policy for payment. Thus, the Insurance Policy safeguards the pre-petition lender from diminution in the value of its interests.

Loan documents, for example, typically contain provisions or covenants requiring insurance coverage for collateral. In these instances, failure to provide insurance is a lack of adequate protection of the secured claim.[18] The same reasoning applies in the instant case. The assets of the pre-petition lender – the Series 2020-3 Notes – are insured. Therefore, the pre-petition lender is adequately protected. As a result, the Debtors respectfully submit that the requirements of section 364(d)(1) of the Bankruptcy Code are satisfied.

**B.**     **The Debtors Should be Authorized to Use Cash Collateral Under 11 U.S.C. § 363.**

Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or

---

[18] *Fannie Mae v. CCH John Eagan II Homes, L.P. (In re CCH John Eagan II Homes, L.P.)*, No. 15-31082, 2016 Bankr. LEXIS 3758, at *15 (Bankr. S.D. Fla. Oct. 17, 2016).

(B) the court approves the use of cash collateral after notice and a hearing.[19] Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."[20]

The Debtors have satisfied the requirements of sections 363(c)(2) and (e) and should be authorized to use Cash Collateral. As noted above, the Debtors intend to provide the appropriate parties with adequate protection for the use of Cash Collateral. Further, the Prepetition Secured Parties will inherently benefit from the Debtors' continued use of the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value. *See, e.g.*, *495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989). Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code

C.    **The Court Should Conduct a Preliminary Expedited Hearing.**

Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain financing may not be commenced earlier than 14 days after the service of such motion. Similarly, Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing."[21] Upon request, however, the Court is authorized to conduct a preliminary expedited hearing on a motion to

---

[19] *See* 11 U.S.C. § 363(c).

[20] 11 U.S.C. § 363(e).

[21] FED. R. BANKR. P. 4001(b)(2).

access the DIP Facility to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (i) authorize the Debtors to obtain DIP Financing and use Cash Collateral to (a) maintain and fund their ongoing operations and (b) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest; and (ii) schedule a Final Hearing on the relief requested herein.

Absent authorization from the Court to immediately access the DIP Facility and Cash Collateral on an interim basis pending a Final Hearing, the Debtors and their stakeholders will be immediately and irreparably harmed. As set forth above, the Debtors' ability to access the DIP Facility on the terms described herein is critical to their ability to continue operations. Accordingly, the Interim Order should be granted.

**D.      The Debtors Require Immediate Access to the DIP Facility.**

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."[22] In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.[23]

The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorization to immediately access up to $1,500,000.00 under the DIP Facility during the Interim Period, is not granted promptly. As further detailed above, the Debtors have an immediate need for access to financing to continue the operation of their business, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' value for the benefit of all parties in interest.

The importance of a debtor's ability to access debtor in possession financing facilities to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other

---

[22] FED. R. BANKR. P. 4001(b)(2), (c)(2).

[23] *See, e.g., In re Seriosa*, Case No. 2:16-BK-14276-RK, 2016 WL 3478953, at *1 (Bankr. C.D. Cal. June 20, 2016).

circuits in similar circumstances.[24]  Accordingly, for the reasons set forth above, entry of the Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2) as well as Bankruptcy Rule 6003(b).

**E.      The DIP Lender Should Be Deemed A Good Faith Lender Under 11 U.S.C. § 364(e).**

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.[25]

As explained in detail herein, the DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms—indeed, the only terms—pursuant to which the Debtors could obtain post-petition financing. All negotiations regarding the DIP Facility were conducted in good faith and on an arms'-length basis by parties represented by separate counsel.  The terms and conditions of the DIP Facility are fair and reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to

---

[24] *See, e.g., In re Fleetwood Enterprises, Inc.*, Case No. 09- 14254-MJ (Bankr. C.D. Cal. Mar. 31, 2009) [Docket No. 183] (approving post-petition financing and modifying the automatic stay where, "[w]ithout the DIP Financing, the Debtors' operations would be discontinued or severely disrupted, and the Debtors would be unable to pay operating expenses, including expense for necessary inventory and payroll, and to operate their businesses in an orderly manner, thereby severely impairing their ability to reorganize."); *see also In re Gardens Reg'l Hosp.*, Case No. 2:16-bk-17463-ER, 2017 WL 7101146, at *3 (Bankr. C.D. Cal. July 28, 2017); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016) [Docket No. 73] (order approving post-petition financing on an interim basis); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [Docket No. 87] (same); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88] (same); *In re Eastman Kodak Co.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 31, 2012) [Docket No. 54] (same).

[25] 11 U.S.C. § 364(e).

the DIP Facility other than as described herein or set forth herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

**F.      The Scope of the Carve-Out Is Appropriate.**

The DIP Facility is subject to the Carve-Out Expenses for professional fees, U.S. Trustee expenses, and Clerk of Court expenses. The Carve-Out Expenses do not directly or indirectly deprive the Debtors' estates or other parties-in-interest of possible rights and powers. Rather, the Carve-Out Expenses ensure that assets will be available for the payment of fees of the Clerk of Court, the U.S. Trustee, and the professional fees of the Debtors and the Committee, if such Committee is appointed.[26] For these reasons, the Debtors submit that the scope of the Carve-Out Expenses is appropriate and should be approved.

**G.      The Automatic Stay Should Be Modified on a Limited Basis.**

The relief requested herein contemplates a modification of the automatic stay to allow the DIP Lender to exercise its rights and remedies under the DIP Loan Documents and the DIP Orders upon five (5) business days' written notice of the occurrence of an uncured Event of Default. Further, to the extent the Debtors seek an emergency hearing in such five (5) business day period, the DIP Lender has consented to such expedited hearing. Stay modifications of this kind are ordinary and standard features for DIP financing, and in the Debtors' business judgment, are reasonable and fair under the present circumstances.[27]

**H.      Bankruptcy Rule 4001(a)(3) Should Be Waived.**

The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the

---

[26] *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

[27] *See, e.g., In re Gardens Reg'l Hosp.*, No. 2:16-BK-17463-ER, 2017 WL 7101146 (Bankr. C.D. Cal. Jul. 28, 2016); *In re Fleetwood Enterprises, Inc.*, Case No. 09-14254-MJ (Bankr. C.D. Cal. Apr. 1, 2009) [Docket No. 183]; *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Apr. 26, 2016) [DocketNo. 87]; *In re Aeropostale, Inc.*, Case No. 1611275 (SHL) (Bankr. S.D.N.Y. May 06, 2016) [Docket No. 99].

expiration of fourteen days after entry of the order, unless the court orders otherwise." As explained herein, immediate access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## X.

## EMERGENCY CONSIDERATION

The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth herein, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the Debtors' viability and that any delay in granting the requested relief could hinder the Debtors' operations and disrupt the efficient restructuring process. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion on an emergency basis.

## X.

## WAIVER OF BANKRUPTCY RULE 6004

The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## XII.

## RESERVATION OF RIGHTS

Nothing contained herein is intended or shall be construed as (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim of any creditor or interest of any interest holder under

applicable bankruptcy or nonbankruptcy law; (iii) a waiver of any claims or causes of action which May exist against any creditor or interest holder; or (iv) an assumption, adoption, or rejection of any agreement, contract, or lease between the Debtors and any third party under section 365 of the Bankruptcy Code. The Debtors reserve all of their rights under the Bankruptcy Code.

## XIII.

## <u>NOTICE</u>

Notice of this Motion has been provided by email, facsimile, or overnight courier to the First Day Notice Parties (as defined in the Motion to Shorten Time) and the other parties referenced in the proposed Interim Order. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A** granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: June 21, 2022                    JONES WALKER LLP


                                        By: */s/ John W. Mills*
                                        John W. Mills
                                        Mark A. Mintz

                                        *Proposed Attorneys for Debtors and Debtors in Possession*