ASSET PURCHASE AGREEMENT

by and among

SERENE INVESTMENT MANAGEMENT, LLC,
as Buyer

and

STORCENTRIC, INC.,
DROBO INC.,
NEXSAN CORPORATION,
NEXSAN TECHNOLOGIES INCORPORATED,
VS ACQUISITION COMPANY, LLC,
CONNECTED DATA, INC.,
and
RETROSPECT, INC.,
as Sellers

Dated as of September 30, 2022

Article 1 DEFINITIONS..............................................................................................................2

    Section 1.01   Definitions..................................................................................................2

Article 2 PURCHASE AND SALE ..............................................................................................2

    Section 2.01   Asset Acquisition.......................................................................................2
    Section 2.02   Assets Sold "As Is, Where Is" ....................................................................9
    Section 2.03   Non-Assignment of Assets .........................................................................9

Article 3 PURCHASE PRICE .....................................................................................................10

    Section 3.01   Purchase of Assets ...................................................................................10
    Section 3.02   Consideration ...........................................................................................10
    Section 3.03   Allocation of Purchase Price.....................................................................10
    Section 3.04   Assets Held in Trust .................................................................................11
    Section 3.05   Deposit .....................................................................................................11
    Section 3.06   Sale Free and Clear ..................................................................................11

Article 4 CLOSING .....................................................................................................................12

    Section 4.01   Closing .....................................................................................................12
    Section 4.02   Deliveries at Closing.................................................................................12

Article 5 REPRESENTATIONS AND WARRANTIES OF SELLERS ...................................13

    Section 5.01   Organization and Qualification; Due Authorization...................................13
    Section 5.02   Violation; Consents and Approvals. ..........................................................13
    Section 5.03   Title to Assets ...........................................................................................14
    Section 5.04   Litigation .................................................................................................14
    Section 5.05   Taxes. ......................................................................................................14
    Section 5.06   Contracts .................................................................................................15
    Section 5.07   Insurance .................................................................................................15
    Section 5.08   Employees Benefits Matters. ....................................................................15
    Section 5.09   Labor Matters Matters...............................................................................15
    Section 5.10   Intellectual Property .................................................................................17
    Section 5.11   Brokers .....................................................................................................18
    Section 5.12   Financial Statements ................................................................................18
    Section 5.13   Permits .....................................................................................................18

Article 6 REPRESENTATIONS AND WARRANTIES OF BUYER.......................................18

    Section 6.01   Organization and Due Authorization .........................................................18
    Section 6.02   No Violation; Consents and Approvals ......................................................18
    Section 6.03   Litigation .................................................................................................19
    Section 6.04   Brokers .....................................................................................................19
    Section 6.05   Financial Ability .......................................................................................19
    Section 6.06   Investigation.............................................................................................20

Case: 22-50515   Doc# 282   Filed: 09/29/22   Entered: 09/29/22 07:38:31   Page 2 of 53

Article 7 COVENANTS OF THE PARTIES ............................................................. 20

 Section 7.01 Cooperation and Efforts.......................................................20
 Section 7.02 Conduct of the Business Pending the Closing ...........................21
 Section 7.03 Bankruptcy Proceedings. ....................................................22
 Section 7.04 Public Announcements .......................................................22
 Section 7.05 Access to Information. ........................................................22
 Section 7.06 Confidentiality ................................................................24
 Section 7.07 Solicitation; Other Offers....................................................24
 Section 7.08 Assumption and Rejection of Executory Contracts and Leases. ...........25
 Section 7.09 Employee Matters. ...........................................................25
 Section 7.10 Cooperation With Respect to Tax Matters.................................26
 Section 7.11 Certain Tax Matters ..........................................................28
 Section 7.12 Casualty Loss .................................................................27
 Section 7.13 Release of Intellectual Property Liens .....................................29
 Section 7.14 Transfer of Acquired Assets; Post-Closing Operation.....................29

Article 8 CONDITIONS TO OBLIGATIONS OF PARTIES ................................... 30

 Section 8.01 Conditions to Obligations of Buyer and Sellers .........................30
 Section 8.02 Conditions to Obligations of Sellers.......................................31
 Section 8.03 Conditions to Obligations of Buyer .......................................32

Article 9 TERMINATION........................................................................... 33

 Section 9.01 Grounds for Termination ....................................................33
 Section 9.02 Procedure of Termination ...................................................35
 Section 9.03 Effect upon Termination ....................................................35

Article 10 SURVIVAL of Representations and Warranties ..................................... 35

 Section 10.01 Survival of Representations and Warranties..............................35

Article 11 MISCELLANEOUS ..................................................................... 36

 Section 11.01 Notices ......................................................................36
 Section 11.02 Amendments and Waivers. ................................................37
 Section 11.03 Expenses ...................................................................37
 Section 11.04 Successors and Assigns.....................................................37
 Section 11.05 Governing Law ............................................................37
 Section 11.06 Jurisdiction................................................................34
 Section 11.07 Waiver of Jury Trial........................................................35
 Section 11.08 Counterparts; Effectiveness; Third Party Beneficiaries...................35
 Section 11.09 Entire Agreement ..........................................................35
 Section 11.10 Severability ................................................................35
 Section 11.11 Specific Performance ......................................................35
 Section 11.12 Certain Acknowledgements and Limitations..............................36
 Section 11.13 Disclosure Schedules ......................................................40

Case: 22-50515 Doc# 282 Filed: 09/29/22 Entered: 09/29/22 07:38:31 Page 3 of
53

Section 11.14  Liquidating Trustee....................................................................40
Section 11.15  Sellers' Representative............................................................40
Section 11.16  Reliance.......................................................................................41
Section 11.17  Time of Essence........................................................................41

ANNEX

A            Reserved
B            Definitions

EXHIBITS

A            Form of Assignment and Assumption Agreement
B            Form of Intellectual Property Assignment Agreement
C            Form of Bill of Sale without Warranty and Assignment
D            Form of Bid Procedures Order

SCHEDULES

Schedule 2.01(a)(i)          List of Specific Assets
Schedule 2.01(a)(vi)         Contracts
Schedule 2.01(b)(i)          Excluded Assets
Schedule 2.01(c)(ii)         Assumed Tax Liabilities
Schedule 5.04                Litigation
Schedule 5.06                Acquired Contracts
Schedule 5.07                Insurance
Schedule 5.08(a)             Company Benefit Plans
Schedule 5.10(a)             Intellectual Property
Schedule 5.10(b)             Intellectual Property Restriction
Schedule 5.10(c)             Intellectual Property Licenses
Schedule 5.13                Permits
Schedule 5.11                Brokers
Schedule 7.08(a)             Contract and Cure Schedule
Schedule 8.01(g)             Transferred Assets of Foreign Affiliates

Case: 22-50515    Doc# 282    Filed: 09/29/22    Entered: 09/29/22 07:38:31    Page 4 of
53

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (together with the Schedules, Exhibits and Annexes hereto, collectively referred to as this "Agreement") dated as of September 30, 2022 is made and entered into by and among SERENE INVESTMENT MANAGEMENT, LLC, a [•] limited liability company ("Buyer" or "Serene"), StorCentric, Inc., a [Delaware] corporation ("StorCentric"), Drobo Inc., a [Delaware] corporation ("Drobo"), Nexsan Corporation, a [Delaware] corporation ("Nexsan"), Nexsan Technologies Incorporated, a [_____] corporation ("Nexsan Technologies"), VS Acquisition Company, LLC, a Delaware limited liability company ("VS Acquisition"), Connected Data, Inc., a [California] corporation ("Connected Data"), and RETROSPECT, INC., a [California] corporation ("Retrospect", and collectively with StorCentric, Drobo, Nexsan, Nexsan Technologies, VS Acquisition and Connected Data, the "Sellers", and each, a "Seller").

## WITNESSETH:

**WHEREAS**, Sellers are engaged in the business of providing data management and storage solutions, with operations in the United States, Canada, India and the United Kingdom (the "Business");

**WHEREAS**, on June 20, 2022 (the "Petition Date"), Sellers filed for relief pursuant to chapter 11 of the Bankruptcy Code with respect to Sellers' Business in the United States, commencing cases in the Bankruptcy Court, which are jointly administered under case number 22-50515 (MEH) (collectively, the "Bankruptcy Case");

**WHEREAS,** Sellers have continued in possession of their respective assets and in the management of their respective businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** on or about July 29, 2022, the DIP Order was entered in the Bankruptcy Case;

**WHEREAS,** in accordance with the Bid Procedures, Buyer has submitted a bid to purchase the assets of the Business with operations in the United States, India and the United Kingdom; and

**WHEREAS,** subject to the terms and conditions expressed herein, and pursuant to the terms of this Agreement, Sellers desire to sell to Buyer and/or, in Buyer's sole discretion, through one or more Buyer Designees, and Buyer desires to purchase from Sellers directly and/or, in Buyer's sole discretion, through one or more Buyer Designees, the Assets (as defined herein), which Assets relate only to the assets of the Business' operations in the United States (the "Purchased Business").

**NOW, THEREFORE**, in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

Case: 22-50515   Doc# 282   Filed: 09/29/22   Entered: 09/29/22 07:38:31   Page 5 of 53

## ARTICLE 1
## DEFINITIONS

Section 1.01  Definitions. Capitalized terms used in this Agreement shall have the meanings ascribed to them in Annex B hereto or as may be set forth throughout this Agreement.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01  Asset Acquisition.

(a)  *Assets*. Subject to the terms and conditions and for the consideration herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, at the Closing, each of the Sellers agrees to unconditionally sell, transfer, assign, convey and deliver to Buyer and/or, in Buyer's discretion, one or more Buyer Designees, and Buyer and/or such Buyer Designees shall purchase, acquire and accept from each of the Sellers, free and clear of all Liens (other than Post-Closing Permitted Liens), the assets, rights, claims and properties of every kind and nature, whether real, personal or mixed, tangible or intangible, whether identifiable or contingent, wherever situated or located, of such Seller, and whether or not reflected on its books and records, other than the Excluded Assets (collectively, the "Assets"), including the following:

(i)  The assets listed on Schedule 2.01(a)(i);

(ii)  All fixed assets and other tangible personal property and equipment, including all machinery, tools, equipment, computers, management information systems (including without limitation all software and hardware related thereto), telephone systems, furniture, fixtures, improvements and supplies, together with all manufacturers' or other warranties pertaining to the same (collectively, the "Equipment");

(iii)  All inventory, components, parts, finished goods, stores, materials, work in progress, and supplies of  the Purchased Business, in each case, whether in transit to or from the Sellers and whether in the possession or under the control of any of the Sellers or any third party, (collectively, the "Inventory"), and including the right of the Sellers to receive such Inventory which are on order as of the Closing;

(iv)  The outstanding accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work that has not been billed, chattel paper, notes and other receivables and amounts owed or that  become owed, together with all unpaid financing charges accrued thereon and any payments with respect thereto ("Accounts Receivable"), all security or collateral therefor and all interest and charges accrued thereon, all rebate receivables, all insurance  claim  receivables (other  than  with  respect to the

2

Excluded Insurance Policies), and all claims, remedies and other rights arising in connection with the foregoing;

(v)     All intellectual property, including all (A) copyrights (registered and unregistered), software (including source code and object code), program files, databases, documentation, drawings, user manuals, websites, social media accounts, mask work rights, design rights, and other works of authorship and corresponding domestic or foreign rights therein, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, whether foreign or domestic, along with all extensions and renewals thereof; (B) trade names, trademarks, trademark applications or registrations, brand names, service names, service marks, service mark applications or registrations, trade dress, logos, corporate names, trade styles, other source or business identifiers, domain names, and URLs (and all goodwill associated with any of the foregoing), whether domestic or foreign or registered, unregistered and/or common law, together with all renewals and extensions thereof; (C) inventions (whether patentable or not), invention disclosures, pending patent applications and issued patents, and any continuations, continuations-in-part, divisional applications, reexaminations and reissues thereof, whether domestic or foreign; (D) confidential information, trade secrets, designs, specifications, know-how, processes and other proprietary information and technology; (E) licenses in respect of any of the foregoing and claims for infringement of or interference with any of the foregoing and the right to recover for past damages; (F) all Technology; and (G) all intellectual property listed on Schedule 5.10(a) (collectively, the "Intellectual Property");

(vi)    All Contracts of Sellers listed on Schedule 2.01(a)(vi) (subject to addition or elimination by Buyer pursuant to Section 7.08 hereof, the "Acquired Contracts");

(vii)   All goodwill, customer relationships, other intangible property, and causes of action, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Assets (including without limitation, the Intellectual Property), the Assumed Liabilities or the Purchased Business;

(viii)  All books and records (financial, accounting, personnel files (to the extent permitted under Applicable Law) and other), and correspondence, and all customer lists, customer sales, cost and pricing information, business plans, research and development, marketing, advertising, packaging and promotional materials,

3

files, plans, data, computer code and software (whether licensed or owned, and whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, blueprints, manuals, engineering and manufacturing data and other technical information and data, and all other business and other records (collectively, "<u>Books and Records</u>"), in each case arising under or relating to the Assets, the Assumed Liabilities or the Purchased Business (but not the Excluded Assets) and whether written, electronic or maintained in some other medium;

(ix)    All permits, licenses, approvals, franchises, notices and authorizations issued by Governmental Authorities (collectively the "<u>Permits</u>");

(x)    All rights to security and other deposits (including, without limitation, customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, royalties, premiums, pre-paid expenses, prepayments, holdbacks, vendor rebates and other refunds paid or payable (including, without limitation, tax refunds for periods on or prior to the Closing to the extent that such refunds were applied for by Buyer or any of its Affiliates or Designees), claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent);

(xi)    All rights, remedies and benefits of Sellers arising under or relating to any of the Assets, the Assumed Liabilities or the Purchased Business, including, without limitation, rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from manufacturers, suppliers, contractors or installers of the Equipment or the Inventory (or components thereof), the other Assets or goods or products purchased or ordered by Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom (including claims for past infringement or misappropriation of intellectual property), and all rights, privileges, set-offs, indemnification rights or claims, causes of action, claims and demands of whatever nature arising from or in connection with the Purchased Business or the Assets;

(xii)    All rights of the Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with current or former employees, officers, directors, consultants, independent

4

contractors and agents of any of the Sellers or any of their Affiliates or with third parties to the extent primarily relating to the Purchased Business or any other Asset (or any portion thereof);

(xiii)   All cash deposits of the Sellers held by any person solely relating to the Assets or securing chargebacks and all refunds paid of payable pursuant to any of the Assets, including any insurance policies of the Sellers;

(xiv)   To the extent expressly identified by the Buyer in writing on or prior to the Closing Date, all purchase orders with suppliers open as of the Closing Date for delivery of goods and services for materials, supplies or other items used in connection with the ownership, operation and/or management of the Purchased Business;

(xv)   All telephone, fax numbers and email addresses of the Sellers;

(xvi)   All right of publicity and all similar rights, including, all commercial merchandising rights;

(xvii)   All Seller Financial Statements and all other financial, marketing and business data, pricing and cost information, business and marketing plans and other information, files, correspondence, records, data, plans, reports and recorded knowledge, historical trademark files, prosecution files of the Sellers in whatever media retained or stored, including computer programs and disks, in each case solely to the extent related to the Assets or the Assumed Liabilities; and

(xviii)   All other property and assets related to, associated with, or pertaining to the Purchased Business or the ownership of any of the Assets, including without limitation, tax attributes, insurance policies (including returns or refunds of premiums paid or other amounts due back) and the proceeds thereof and all other tangible and intangible assets that are not expressly identified as Excluded Assets;

provided that no Assets shall be transferred to the extent (A) such transfer is prohibited by Applicable Law except to the extent overridden by the Bankruptcy Code or the Sale Order, (B) it would involve the transfer of information or documentation that is protected by attorney-client privilege, or (C) it would involve the transfer of any information related to bids or proposals by third parties.

(b)   *Excluded Assets*. Sellers shall not sell, assign, convey or deliver to Buyer, and Buyer shall not purchase from Sellers, and the Assets shall not include, any of the following (collectively, the "Excluded Assets"):

5

(i)      All of the assets set forth on Schedule 2.01(b)(i) hereto;

(ii)     All Contracts that are not Acquired Contracts;

(iii)    All securities, instruments and other investments of Sellers, including all shares of capital stock or other equity interests in or issued by Vexata Data Systems Private Limited, a private Indian company, or by Nexsan Technologies Ltd., [a company organized under the laws of England and Wales],[1] and all bank accounts;

(iv)     All rights of Sellers under or with respect to any of the Avoidance Actions;

(v)      All directors' and officers' liability insurance policies (the "Excluded Insurance Policies") and any rights of the Company and or its directors and officers thereunder;

(vi)     All shares of capital stock or other equity interests in, or owned by, any Seller, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests in, or owned by, any Seller, including any of the foregoing relating to any non-U.S. entity owned directly or indirectly by StorCentric;

(vii)    Any rights of any of Sellers to tax refunds, credits or similar benefits related to the Business solely with respect to any period on or prior to the Closing;

(viii)   Sellers' corporate minute books, equity transfer records and corporate seal, provided that Buyer shall have the right to make copies of any portions of such books and records relevant to its ownership or use of the Assets; and all Books and Records to the extent arising under or relating to the Excluded Assets or the Excluded Liabilities;

(ix)     All Company Benefit Plans;

(x)      All items described in the proviso at the end of Section 2.01(a);

(xi)     All intercompany obligations;

(xii)    All confidential records, documents or other information relating to current or former employees, and any materials containing

---

[1] NTD: This should include the Canadian subsidiary as well.  Please insert.

6

information about current or former employees, to the extent disclosure of which to Buyer would violate applicable Law;

(xiii) The Sellers' rights under this Agreement and the other Transaction Documents, and all consideration payable or deliverable to the Selling Entities pursuant to the terms and provisions hereof; or

(xiv) All rights or remedies related to any Excluded Asset.

(c) *Assumed Liabilities*. Subject to (A) the entry of the Bid Procedures Order and the Sale Order, and (B) the terms and conditions of this Agreement, at the Closing, Sellers shall assign to Buyer and Buyer shall assume from Sellers and pay when due, perform or discharge as and when due (except as expressly provided below) the following obligations and liabilities of Sellers relating to the Assets, and only such obligations and liabilities (collectively, the "Assumed Liabilities"):

(i) The obligations and liabilities of Sellers under each of the Acquired Contracts that arise after the Closing Date, and the Cure Costs applicable to such Acquired Contracts.

(ii) Liabilities of Sellers with respect to Taxes, assessments or other governmental charges set forth on Schedule 2.01(c)(ii), to the extent such Taxes relate to a taxable period (or portion thereof) beginning on and after the Closing Date but are not yet due and owing (and not, for the avoidance of doubt, any such Taxes assessments or other governmental charges that are due and owed on or prior to, or otherwise relate to periods prior to, the Closing Date);

*provided, however*, that notwithstanding anything to the contrary set forth herein, Assumed Liabilities shall not include any Excluded Liabilities.

(d) *Excluded Liabilities*. Except for the Assumed Liabilities assumed by Buyer pursuant to Section 2.01(c) hereof, Buyer shall not assume nor be deemed to assume and shall have no responsibility or obligation with respect to, any other obligations or liabilities of or claim against, Sellers, the Business or the Assets (collectively, the "Excluded Liabilities"). All such Excluded Liabilities shall be retained by and remain liabilities and obligations of the Sellers. The Excluded Liabilities shall include, without limitation, the following liabilities and obligations:

(i) all Taxes of the Sellers, including Taxes imposed on the Sellers or which the Sellers are otherwise liable under Treasury Regulations Section 1.1502-6 and similar provisions of state, local or foreign applicable Tax law, as a successor or transferee, by contract or under Applicable Law;

(ii) all liabilities of the Sellers relating to legal services, accounting services, financial advisory services, investment banking services

7

or any other professional services ("Professional Services") performed in connection with this Agreement and any of the transactions contemplated hereby, and any pre-Petition Date or post-Petition Date Claims for such Professional Services;

(iii) all liabilities arising out of, relating to, or with respect to any Company Benefit Plan (including any liabilities related to any Company Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or Code Section 412), irrespective of whether such liabilities are incurred, recognized, paid or made, as applicable, on, before or after Closing;

(iv) all liabilities or claims arising out of, relating to or with respect to the employment or performance of services for, or termination of employment or services for, or potential employment or engagement for the performance of services for, any of the Sellers (or any predecessor) of any individual Person or any Person acting as a professional employer organization, employee leasing company or providing similar services on or prior to the Closing (including as a result of the transactions contemplated by this Agreement), including liabilities or claims for workers' compensation, severance (including statutory severance), separation, termination, or notice pay or benefits (including under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and Section 4980B of the Code), liabilities of the Sellers pursuant to the WARN Act (and Seller shall cause to be filed and delivered all notices in respect thereof), or any form of accrued or contingent compensation (including leave entitlements), or in connection with any non-compliance of the Sellers with (and claims that have been or may be made against under any pending action in connection with) any Applicable Laws relating to wages, hours, pay equity, employment equity, conditions of employment, employment standards, human rights, employee privacy, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding Taxes and/or social security Taxes and contributions and any similar Tax or contribution;

(v) all liabilities arising out of or relating to any business or property formerly owned or operated by any of the Sellers, any Affiliate or predecessor thereof, but not presently owned and operated by any of the Sellers;

(vi) all liabilities of the Sellers to their respective equity holders respecting dividends, distributions in liquidation, redemptions of

8

interests, option payments or otherwise, and any liability of the Sellers pursuant to any Contract with any Affiliate of the Sellers;

(vii)   all accounts payable and other amounts payable of any Seller owed by it to any other Seller or its subsidiaries;

(viii)  except for any Assumed Liabilities, all liabilities of the Sellers in respect of the Business or the Assets arising at any time to the extent related to obligations, matters or circumstances occurring or existing prior to the Closing;

(ix)    all liabilities of the Sellers in respect of indebtedness under credit facilities, promissory notes, charges, mortgages, pledges and similar agreements or instruments;

(x)     all liabilities and penalties arising in connection with any violation of Applicable Law or Order by any of the Sellers;

(xi)    all liabilities arising under any escheatment, abandoned property or similar Law with respect to the Assumed Liabilities or which otherwise remain with any Sellers;

(xii)   any other liabilities for tort claims, including all consumer and products liability claims of any nature;

(xiii)  all liabilities relating to Excluded Assets;

(xiv)   all liabilities in respect of any Contracts or leases that are not Acquired Contracts; and

(xv)    any other liability of the Sellers that is not expressly included among the Assumed Liabilities.

Section 2.02  Assets Sold "As Is, Where Is". BUYER ACKNOWLEDGES AND AGREES THAT THE ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, EXCEPT AS SET FORTH IN ARTICLE 5 OF THIS AGREEMENT, NO SELLER MAKES ANY  REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT NONE OF THE SELLERS HAVE MADE ANY  AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ASSETS BEING SOLD TO BUYER,

AND THAT BUYER TAKES ALL SUCH ASSETS IN THE CONDITION EXISTING ON THE CLOSING DATE "AS IS, WHERE IS" AND "WITH ALL FAULTS."

Section 2.03    Non-Assignment of Assets.  Anything contained herein to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any Asset if, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, any waiver by the applicable counterparty, and the provisions of the Sale Order (including any elimination of such consent or approval or deemed consent or approval set forth therein), an attempted assignment thereof, without obtaining a consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way negatively affect the rights of Buyer, as the assignee of such Asset.  If, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code, any waiver by the applicable counterparty, and the provisions of the Sale Order, such consent or approval is required but not obtained, Sellers shall (a) not transfer or purport to transfer any such Asset to any Person other than Buyer or its Affiliates and (b) to the extent reasonably practicable to do so, cooperate with Buyer in good faith without further consideration in any reasonable and mutually agreeable arrangement designed to provide for Buyer the benefits and obligations of or under any such Asset, including subcontracting, sublicensing or subleasing to Buyer, or enforcement for the benefit of Buyer of, any and all rights of Sellers against a third party thereto arising out of the breach or cancellation thereof by such third party; provided that Buyer shall undertake to pay or satisfy the corresponding liabilities for the enjoyment of such benefit to the extent that Buyer would have been responsible therefor hereunder if such consent or approval had been obtained prior to Closing (and Seller shall pay or bear responsibility for any additional liabilities).  Any assignment to Buyer of any Asset that shall, after giving effect to the provisions of sections 363 and 365 of the Bankruptcy Code any waiver by the applicable counterparty, and the provisions of the Sale Order, require the consent or approval of any third party for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

**ARTICLE 3**
**PURCHASE PRICE**

Section 3.01    Purchase of Assets. On the terms and subject to the conditions of this Agreement and the Bid Procedures Order and the Sale Order, at the Closing, Buyer shall (a) purchase the Assets and assume the Assumed Liabilities from Sellers, and (b) pay the Purchase Price as set forth in Section 3.02 hereof.

Section 3.02    Consideration. As consideration for the Assets, at the Closing, Buyer shall pay to Sellers via a credit bid an amount equal to the Serene Debt and assume all Assumed Liabilities in accordance with this Agreement (the "Purchase Price").

Section 3.03    Allocation of Purchase Price. If the Transactions are an "Applicable Asset Acquisition" as defined in Section 1060(c) of the Code, then within 60 days after the Closing, Buyer shall prepare and deliver to Seller a proposed statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "Allocation Statement"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably

10

withheld or delayed. The Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Return, and shall not voluntarily take any position inconsistent therewith. If the Internal Revenue Service ("IRS") or any other taxation authority proposes a different allocation, Sellers or Buyer, as the case may be, shall promptly notify the other Party of such proposed allocation. Sellers or Buyer, as the case may be, shall provide the other Party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other Party to carry out the purposes of this Section 3.03. Except as otherwise required by Applicable Law or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the Transactions shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.03; and (ii) neither Party (nor any of its Affiliates) will take any position inconsistent with this Section 3.03 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Assets or the allocation of the value of the Assets in any plan or reorganization or liquidation that may be proposed.

Section 3.04    Assets Held in Trust. Following the Closing, any amounts paid by customers or other third parties (i) to Sellers that constitute Assets shall be held in trust by Sellers for the benefit of Buyer and tendered by Sellers to Buyer promptly after the receipt thereof, and (ii) to Buyer that constitute Excluded Assets shall be held in trust by Buyer for the benefit of Sellers and tendered by Buyer to Sellers promptly after the receipt thereof. Any Party charged with the obligation to tender any such payment to the other Party under this Section 3.04 shall tender such payment in the same form of consideration as such payment was made to such Party by any customer or other third party.

Section 3.05    Sale Free and Clear. On the Closing Date, the Assets shall be transferred to Buyer free and clear of all Liens, other than (a) the Post-Closing Permitted Liens, if any, and (b) the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

**ARTICLE 4**
**CLOSING**

Section 4.01    Closing. Subject to the satisfaction of each of the conditions set forth in Article 8 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Assets and the assumption of the Assumed Liabilities provided for in Article 2 hereof (the "Closing"), shall take place at 10:00 a.m., Pacific Time, virtually by the electronic exchange of documents (or at such other place as the Parties may mutually agree in writing) on September 30, 2022, or on such other date and time as Sellers and Buyer may mutually agree in writing. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date". The Closing shall be deemed effective at 11:59 p.m., Pacific Time, on the Closing Date.

Section 4.02    Deliveries at Closing.

(a)    *Deliveries by Buyer.* At the Closing, Buyer shall pay or deliver to Sellers the following:

11

(i)     An Assignment and Assumption Agreement in the form of _Exhibit A_ (the "Assignment and Assumption Agreement"), executed by Buyer;

(ii)    An Intellectual Property Assignment Agreement in the form of Exhibit B (the "Intellectual Property Assignment Agreement"), executed by Buyer;

(iii)   A certificate signed by an authorized person of Buyer in accordance with Section 8.02(a) and (b) hereof; and

(iv)    Such other documents as Sellers may reasonably request that are customary for transactions substantially similar to the Transactions as may be necessary to transfer the Assets and Assumed Liabilities to Buyer.

(b)     _Deliveries by Sellers_. At the Closing, Sellers shall deliver to Buyer the following:

(i)     A certified copy of the Sale Order;

(ii)    A Bill of Sale Without Warranty and Assignment in the form of Exhibit C (the "Bill of Sale"), executed by Sellers;

(iii)   The Assignment and Assumption Agreement executed by Sellers;

(iv)    The Intellectual Property Assignment Agreement executed by Sellers;

(v)     One or more certificates signed by an authorized person of each Seller in accordance with Section 8.03(a) and (b);

(vi)    certified copies of the resolutions duly adopted by the Sellers' board of directors or equivalent governing body authorizing the execution, delivery and performance of this Agreement and each of the other transactions contemplated hereby to which each Seller is a party;

(vii)   termination statements, in form and substance reasonably satisfactory to Buyer, on Form UCC-3 or such other appropriate form that, when filed or recorded, as the case may be, will be sufficient and effective to release any and all liens against the Assets under the Sellers' credit facilities; and

12

(viii)   Such other documents as Buyer may reasonably request that are customary for transactions substantially similar to the Transactions.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the corresponding sections or subsections of the Disclosure Schedule, each Seller hereby severally and not jointly represents and warrants to Buyer with respect to such Seller as follows:

Section 5.01   Organization and Qualification; Due Authorization.

(a)   Each Seller is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted, subject to the limitations, if any, imposed by applicable bankruptcy law. Each Seller is duly qualified to do business and is in good standing in all jurisdictions except in which the failure to so qualify would constitute a Material Adverse Effect.

(b)   Each Seller has full corporate power and authority to execute and deliver this Agreement and the Other Transaction Documents to which it is a party, and, subject to the approval of the Bankruptcy Court, to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution and delivery of this Agreement and the Other Transaction Documents to which any Seller is a party and the performance and consummation of the Transactions by such Seller have been duly authorized by all necessary corporate action on the part of such Seller.

(c)   This Agreement and the Other Transaction Documents to which any Seller is a party have been duly executed and delivered by such Seller and, subject to the approval of the Bankruptcy Court and the due authorization, execution and delivery of such agreements by the other parties thereto (other than other Sellers), this Agreement and the Other Transaction Documents constitute valid and binding obligations of such Seller, enforceable against such Seller in accordance with their terms.

Section 5.02   Violation; Consents and Approvals.

(a)   Neither the execution and delivery by any Seller of this Agreement or the Other Transaction Documents to which it is a party nor, after giving effect to the Bid Procedures Order and the Sale Order, the consummation of the Transactions nor, after giving effect to the Bid Procedures Order and the Sale Order, compliance by it with any of the provisions hereof or thereof will (i) conflict with or result in a violation of (A) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (B) any Order, statute, law, ordinance, rule or regulation binding upon such Seller or by which the Business or any Assets are subject or bound, (ii) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (A) any Acquired Contract, or (B) any material license, permit, authorization, Order or approval of or registration, declaration or filings with, any Governmental Authority, or

13

(iii) result in the creation of any Lien (other than a Post-Closing Permitted Lien) upon the properties or assets of such Seller being sold or transferred hereunder except in the case of clauses (i)(B), (ii) and (iii) as would not have a material impact on the ability of the parties to consummate the transactions contemplated by this Agreement or on the Business.

(b)    Other than the Bid Procedures Order and the Sale Order, no waiver, Order, Permit or authorization of or from, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of Sellers in connection with the execution and delivery of this Agreement or the Other Transaction Documents, or the performance or compliance by Sellers with any of the provisions hereof or thereof, including the assignment of the Acquired Contracts.

Section 5.03    Title to Assets. Subject to the entry of the Sale Order, Sellers (i) have good and valid title to all the Assets (ii) free and clear of all Liens (except for those that will be released upon Closing and Post-Closing Permitted Liens), and at the Closing will convey good and valid title to all of such Assets to Buyer, free and clear of all Liens, except for the Assumed Liabilities and Post-Closing Permitted Liens.

Section 5.04    Litigation; Compliance with Orders, Applicable Laws and Permits. Except as set forth on Schedule 5.04 hereto, other than in connection with the Bankruptcy Case, there are no claims, charges, actions, suits or Proceedings pending, or to Sellers' Knowledge, threatened against or affecting Sellers or the Business that (a) seek to impair, restrain, prohibit, delay or invalidate the transactions contemplated by this Agreement, at law, in equity or otherwise, in, before, or by any Governmental Authority, arbitrator or mediator, (b) are material in amount or in potential consequence that relates to any of the Assets or Assumed Liabilities, or (c) that would reasonably be expected to materially affect the ownership, operation or management of the Business by the Buyer or any Buyer Designee from and after the Closing or materially impair Buyer's rights in and to, or use of, the Assets from and after the Closing. No Seller is (i) in default under any Order of any Governmental Authority or (ii) in material non-compliance with any Applicable Law or Permit relating to the Assets, the Assumed Liabilities or the operation of the Business as currently conducted.

Section 5.05    Taxes.

(a)    Sellers have filed all material Tax Returns required to be filed and have timely paid all material taxes due and owing (whether or not shown on any filed Tax Return).

(b)    There are no Liens, Claims or interests for Taxes other than Permitted Liens upon the Assets.

(c)    Sellers have withheld and timely paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(d)    There is not currently any audit exam, notice of deficiency, refund litigation, Claim, or notice of assessment or proposed assessment pending, or to Sellers' Knowledge threatened, involving Sellers.

14

(e)     No Seller is a party to any Tax sharing or Tax allocation agreement (other than any agreement entered into in the ordinary course of business and not primarily concerning Taxes) related to the Business, and none of the Assets are encumbered by any such agreement.

Section 5.06    Contracts.  Except as set forth on Schedule 5.06, subject to entry of the Sale Order and Payment of all Cure Costs, as of the date of this Agreement, each of the Acquired Contracts is valid, binding and in full force and effect, enforceable by the Seller party thereto in accordance with its terms, subject to the limitations, if any, imposed by applicable bankruptcy laws, and there has not been any cancellation or, to Sellers' Knowledge, threatened cancellation of any such Acquired Contract.  No Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default under any Acquired Contract except for breaches or defaults (i) that would be remedied solely by the payment of Cure Costs, (ii) caused solely by the filing of Sellers' Bankruptcy Case or (iii) as set forth on Schedule 5.06 hereto.  To Sellers' Knowledge, no other party to any of the Acquired Contracts is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder.  Complete and correct copies (including all material modifications and amendments) of all material Contracts of the Sellers have been provided or made available to Buyer in the online data room.

Section 5.07    Insurance.  Schedule 5.07 hereto sets forth a summary of each insurance policy carried by Sellers (including any self-insurance programs) and complete and correct copies thereof (including all material modifications, amendments, qualification and riders) have been provided or made available to Buyer.  All such insurance policies are valid and in full force and effect and all premiums thereon have been paid.  (a) The Sellers are in compliance in all material respects with the terms and provisions of such policies, (b) such policies provide insurance in such amounts and against such risks as is sufficient to comply with Applicable Law and which reflect coverages and policy terms that are customary and reasonably adequate for the industry in which the Sellers operate, and (c) the Sellers are not in breach or default, and none of the Sellers has taken any action or failed to take any action which, with notice, the lapse of time or the happening of any other event or condition, would constitute such a breach or default, or permit termination or modification of, any of such insurance policies. There are no pending written notices of cancellation or nonrenewal of any insurance policy referred to in this Section 5.07, nor, to the Sellers' Knowledge, has the termination of any such insurance policy been threatened and there exists no event, occurrence, condition or act (including the purchase of the Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, could, to the Sellers' Knowledge, entitle any insurer to terminate or cancel any such insurance policies.

Section 5.08    Employees Benefits.

(a)     Except as set forth in Schedule 5.08(a), Sellers do not sponsor, maintain or contribute to or have any obligation to maintain or contribute to, or have any direct or indirect liability with respect to any plan, program, arrangement or agreement related to the Business that is a pension, profit-sharing, savings, retirement, employment, consulting, severance, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, salary continuation, retention, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies to which a

15

Seller is the owner, the beneficiary or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, practice, arrangement, policy or agreement, whether written or oral, including, without limitation, any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA under which any employees of Sellers who are engaged in the Business ("Employees") as of the date hereof or former Employees, current or former officers, directors, leased employees, consultants or agents (or their respective beneficiaries) of any Seller has any present or future right to benefits ("Company Benefit Plans"). All references to "Sellers" in this Section 5.08 shall refer to (i) any of Sellers and (ii) their subsidiaries and any employer that would be considered a single employer with any of Sellers under Sections 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate").

(b)     Each Company Benefit Plan has been maintained and administered in all material respects in compliance with its terms and with the requirements prescribed by all laws applicable to such Company Benefit Plans. All contributions, reserves or premium payments required to be made or accrued as of the date hereof to the Company Benefit Plans have been in all material respects timely made or accrued.

(c)     No plan currently or ever in the past maintained, sponsored, contributed to or required to be contributed to by Sellers or any of their respective current or former ERISA Affiliates is or ever in the past was (i) a "multiemployer plan" as defined in Section 3(37) of ERISA, (ii) a plan described in Section 413 of the Code, (iii) a plan subject to Title IV of ERISA, (iv) a plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA, or (v) a plan maintained in connection with any trust described in Section 501(c)(9) of the Code.

(d)     No Seller is subject to any material liability or penalty under Sections 4975 through 4980B of the Code or Title I of ERISA. Sellers have complied in all material respects with all applicable health care continuation requirements in Section 4980B of the Code and in ERISA. No material "prohibited transaction," within the meaning of Section 4975 of the Code or Sections 406 or 407 of ERISA and not otherwise exempt under Section 408 of ERISA, has occurred with respect to any Company Benefit Plan.

Section 5.09   Labor Matters.  During the past three years, Sellers have complied in all material respects with all Applicable Laws relating to the hiring of employees and the employment of labor, including provisions relating to wages, hours, equal opportunity, anti-discrimination, anti-harassment, anti-retaliation, collective bargaining and payment of social security or other taxes. No Seller or any of its subsidiaries is party to any collective bargaining agreement or other labor union contract and, to the Sellers' Knowledge, no current employees are represented by any labor organization, trade union, works council, employee representative, employee congress or other form of employee association or representative. No labor organization (or representative thereof) or current employee or group of current employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending to the Sellers' Knowledge.

Section 5.10   Intellectual Property.

Case: 22-50515   Doc# 282   Filed: 09/29/22   Entered: 09/29/22 07:38:31   Page 20 of 53

(a)     Schedule 5.10(a) hereto sets forth an accurate and complete list of all registered Intellectual Property and all other material Intellectual Property owned by or licensed to Sellers that is used in the operation of the Business as currently conducted, indicating whether such property is owned or licensed (such schedule showing, for each and as applicable, the registration or application number, jurisdiction, filing and expiration dates (if any), and products in which they are used).  To the Sellers' Knowledge, all of the Intellectual Property is valid, subsisting and enforceable.

(b)     Except as set forth on Schedule 5.10(b) hereto, Sellers solely own or are licensed or otherwise have the right to use (to the extent required to operate the Business in the ordinary course) and to transfer to Buyer hereunder, free from any Liens (other than Post-Closing Permitted Liens), and without payment to or consent from any other party, the Intellectual Property; none of the Intellectual Property is subject to any Order; and the consummation of the Transactions will not alter or impair such rights (other than that all such rights will be assigned to Buyer).

(c)     No claims have been asserted in writing against any Seller by any Person with respect to the ownership, validity, enforceability or use of any of the Intellectual Property, or challenging or questioning the validity, effectiveness, enforceability, use or ownership of any of the Intellectual Property in any jurisdiction, nor, in any case, to the Sellers' Knowledge, is there any valid basis for any such claim.  To the Sellers' Knowledge, (i) no Person is infringing upon, misappropriating or violating the rights in the Intellectual Property of Sellers, and (ii) the operation of the Business and the use of the Assets and Intellectual Property in the operation of the Business has not infringed and does not infringe upon, misappropriate or otherwise violate the rights of any Person.

(d)     Schedule 5.10(d) hereto sets forth an accurate and complete list of all Contracts pursuant to which any Seller grants to any other Person the right to use any Intellectual Property.

(e)     The Sellers have complied in all material respects with all Applicable Laws relating to the privacy of, and the collection, use, storage and disclosure of personal information. To the Sellers' Knowledge, there has been no material unauthorized access to, unauthorized disclosure of, or other misuse of any personal information collected by the Sellers. To the Sellers' Knowledge, none of the Sellers has experienced any material breach of security or other material unauthorized access by third parties to personal information, and none of the Sellers has received any complaint regarding the collection, use or disclosure of personal information. The execution, delivery and performance of this Agreement, including the delivery of all personal information included in the Assets, will comply with all Applicable Laws relating to privacy and with the privacy policies of the Sellers.

Section 5.11    Brokers. Except as set forth on Schedule 5.11 hereto, neither Sellers nor any Affiliates thereof are parties to any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer, Sellers or any Affiliates thereof to pay any finder's fee, brokerage commission or similar payment in connection with the Transactions.

Section 5.12    Permits. Except as set forth in Schedule 5.12, the Sellers have obtained and possess all material Permits which are necessary for the lawful conduct of the Business as presently conducted and operated and as such is anticipated to be conducted and operated from and after the Closing, or which are necessary for the lawful ownership of their properties and assets or the operation of the Business as presently conducted and operated and as such is anticipated to be conducted and operated from and after the Closing. Each such Permit is valid and in full force and effect and none of such material Permits will be terminated or impaired or become terminable, in whole or in part, as a result of the occurrence of the transactions contemplated hereby.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

Section 6.01    Organization and Due Authorization. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of [•]. Buyer has full limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or to the extent to be entered into on or prior to the Closing, will be) a party and to consummate the Transactions. The execution and delivery of this Agreement and the other Transaction Documents to which Buyer is (or will be) a party and the performance and consummation of the Transactions by Buyer have been duly authorized by all necessary action on the part of Buyer. This Agreement and the other Transaction Documents to which Buyer is a party have been (or to the extent to be entered into on or prior to the Closing, will be) duly executed and delivered by Buyer and, subject to the due authorization, execution and delivery of such agreements by the other parties thereto, this Agreement and the other Transaction Documents  constitute (or to the extent to be entered into on or prior to the Closing, will constitute) the valid and binding obligations of Buyer, enforceable against Buyer in accordance with their terms.

Section 6.02    No Violation; Consents and Approvals. Neither the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which it is a party nor the consummation of the Transactions nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the Organizational Documents of Buyer or (ii) any Order, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, Permit, authorization, or Order of, or registration, declaration or filings with, any Governmental Authority, except, in the case of clauses (i)(B), (ii) and (iii), as has not had and would not reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the Transactions.  No waiver, Order, Permit or authorization of or from, or declaration or filing with, or notification to, any Person or Governmental Authority is required on the part of the Buyer in connection with the execution and delivery of this Agreement or other Transaction Documents, or the compliance by Buyer with any of the provisions hereof or thereof.

18

Section 6.03    Litigation.  There is no claim, action, lawsuit, or Proceeding, or to Buyer's Knowledge, any pending inquiry or investigation or any threatened claim, action, lawsuit, Proceeding, inquiry or investigation, in each case, by or against or affecting Buyer which has had or would be reasonably expected to have a material adverse effect on the ability of Buyer to consummate the Transactions.

Section 6.04    Brokers. Except as provided for in any adequate protection order approved by the Bankruptcy Court to which Buyer has not objected, in connection with the Transactions, neither Buyer nor any Affiliate thereof is a party to any agreement, arrangement or understanding with any Person which will result in the obligation of Buyer, Sellers or any Affiliate thereof to pay any finder's fee, brokerage commission or similar payment.

Section 6.05    Financial Ability.  Buyer has sufficient funds committed and unconditionally available to it to perform all of Buyer's obligations under this Agreement in accordance with the terms of this Agreement and to assume the Assumed Liabilities.

Section 6.06    Investigation.  Buyer is knowledgeable of the industry and of the usual and customary practices of a business in the industry. Further, Buyer is a party capable of making such investigation, inspection, review and evaluation of the Assets as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Assets, their value, operation and suitability. Buyer confirms, acknowledges and agrees that it has had access to and has inspected the books, records and assets of Sellers to its satisfaction   prior to the execution of this Agreement and that Buyer is relying entirely upon its own investigations and inspections of the books, records and assets of Sellers, including the Assets, prior to the execution of this Agreement in entering into this Agreement and proceeding with the Transactions on the terms as set forth herein. Buyer acknowledges and agrees that any description of Sellers, their businesses, operations and assets in this Agreement, the Disclosure Schedules or any other Transaction Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by Sellers in respect of the accuracy of any such description. Buyer has reviewed and has had access to all documents, records and information which it has desired to review prior to the execution of this Agreement, and has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement, and to consummate the Transactions. In deciding to enter into this Agreement, and to consummate the Transactions, other than the express representations and warranties of Sellers set forth in Article 5, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis and not on any disclosure or representation made by, or any duty to disclose on the part of, Sellers or Sellers' Representatives.   Except as expressly stated by Sellers in Article V, Buyer acknowledges and agrees that the Assets are sold "as is, where is", and the Buyer agrees to accept the Assets in the condition they are in on the Closing Date.

## ARTICLE 7
## COVENANTS OF THE PARTIES

Section 7.01    Cooperation and Efforts. Subject to the terms and conditions of this Agreement and subject to the Bankruptcy Code and any Orders of the Bankruptcy Court, Buyer and Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the

19

Transactions and, without limiting the foregoing, promptly following the date hereof, the Sellers shall use their commercially reasonable efforts, and Buyer shall reasonably cooperate in (i) obtaining, prior to the Closing Date, all consents and approvals from third parties necessary to transfer, convey and assign to Buyer and/or a Buyer Designee the Assets and Assumed Liabilities, and (ii) connection with the Employment Offers made by the Buyer or its Affiliates; provided that the Parties understand and agree that the commercially reasonable efforts of any Party shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions; provided that this Section 7.01 shall not (a) limit or affect the obligation of any Party to perform its obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to third parties not otherwise required under this Agreement. Sellers and Buyer agree to execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

Section 7.02    Conduct of the Business Pending the Closing.

(a)    From the date hereof until the Closing or, if earlier, the termination of this Agreement, except (i) as required by this Agreement or any other Transaction Documents, (ii) as required under any lease, Contract, or instrument listed on any Schedule hereto, (iii) as required by any Applicable Law or any Governmental Authority (including by Order of the Bankruptcy Court or fiduciary duty of the boards of directors or other governing body of Sellers) or any requirements or limitations resulting from the Bankruptcy Case, (iv) to the extent related solely to Excluded Assets and/or Excluded Liabilities, or (v) as otherwise consented to in writing by Buyer (which, if such consent is requested by Sellers, shall not be unreasonably withheld, conditioned or delayed), Sellers shall (A) conduct the Business in compliance in all material respects with all Applicable Laws, rules and regulations, (B) use commercially reasonable efforts to preserve its relationships with the current customers, distributors, suppliers and vendors of the Business, (C) not take any action, or omit to take any action, the intent of which is to cause the termination of their current officers, (D) perform in all material respects the obligations required to be performed by Sellers under the Acquired Contracts and not reject any Acquired Contracts without the prior written consent of the Buyer, (E) maintain their books and records on a basis consistent with prior practice, (F) bill for products sold or services rendered and pay accounts payable in a manner consistent with past practice, (G) maintain all insurance policies set forth on Schedule 5.07 hereto, or suitable replacements therefor, in full force and effect until the Closing Date, and (H) preserve in all material respects the Assets (other than sales of Inventory in the ordinary course of business.

(b)    Without limiting the generality of Section 7.02(a), the Sellers shall not: (i) sell, lease (as lessor), sublease, transfer or otherwise dispose of (or permit to become subject to any Lien, other than Permitted Liens, Liens arising under any Bankruptcy Court orders relating to the use of cash collateral (as defined in the Bankruptcy Code), and Liens that will be discharged and removed and not be enforceable against any Asset following the Closing in accordance with the Sale Order) any Assets, other than (A) the sale of Inventory in the ordinary course of business, (B) the collection of receivables, (C) the use of prepaid assets and Documentary Materials in the conduct of the Business in the ordinary course of business and (E) making adequate protection

20

payments required by the Bankruptcy Code and approved by the Bankruptcy Court; (ii) solely with respect to any action which could have an adverse effect on Buyer or any of its Affiliates, or their operation, management or ownership of the Business and the Assets following the Closing, make or rescind any material election relating to Taxes, settle or compromise any material claim, action, suit, litigation, legal proceeding, arbitration, investigation, audit or controversy relating to Taxes, or, except as required by Applicable Law or GAAP, make any material change to any of its methods of Tax accounting, methods of reporting income or deductions for Tax or Tax accounting practice or policy from those employed in the preparation of its most recent Tax returns; (iii) acquire any material assets or properties, make any material loans or advances or make any other material investment in any such event outside the ordinary course of business, except as may otherwise be required by the terms of any Contract in effect as of the date of this Agreement or pursuant to the terms of Section 7.01(a); (iv) enter into or agree to enter into any merger or consolidation with any corporation or other entity; (v) except in the ordinary course of business, cancel or compromise any material debt or claim or waive or release any material right, in each case, that is a debt, claim or right that is an Asset or Assumed Liability; (vi) terminate, permit to expire, amend or fail to renew, obtain or preserve any material Permit; (vii) incur, create, assume guarantee or become liable for any indebtedness outside of the ordinary course of business or that would require the approval of the Bankruptcy Court; (viii) except in the ordinary course of business, fail to maintain in full force and effect any filings necessary to maintain the Intellectual Property; (ix) enter into, amend, fail to renew or extend, or terminate all or any part of any Acquired Contract; or (x) agree or commit to do any of the foregoing.

Section 7.03   <u>Bankruptcy Proceedings</u>.  Sellers shall give all notices required to be given by applicable Law, to all Persons entitled thereto, of all motions (including the motions seeking entry of the Sale Order), orders, hearings and other proceedings relating to this Agreement and the transactions contemplated hereby and thereby and such additional notice as ordered by the Bankruptcy Court or as Buyer may reasonably request.  Upon the execution hereof, Sellers shall use commercially reasonable efforts to obtain entry of the Sale Order.  At the Sale Hearing, as the same may be continued, the Seller shall seek entry of the Sale Order, which shall approve the sale of the Purchased Assets and determine the Cure Costs in accordance with this Agreement. The Sale Order shall be in a form and substance acceptable to the Buyer, and shall specifically include (a) a finding that the Buyer and/or the Buyer Designees is acting in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, and (b) the Assets are being transferred free and clear of Liens, claims, encumbrances, and interests, within the meaning of Section 363(f) of the Bankruptcy Code. The Seller and the Buyer shall give prompt notice to each other of (i) any written notice or other written communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated hereby is not likely to be obtained prior to Closing, and (ii) any written objection or proceeding that challenges such transactions or the entry of the Sale Order.  After entry of the Sale Order, Sellers shall not take any action which is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.04   <u>Public Announcements</u>. Each Party agrees that the consent (as to both form and content), not to be unreasonably withheld, of the other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions (whether before or after the Closing), except to the extent that such press release or other public announcement is required by Applicable Law and

21

such prior notice is not practicable given the circumstances giving rise to the requirement to issue such release; provided that Sellers shall be permitted to issue a press release or make a public announcement upon the execution of this Agreement to announce such execution of this Agreement and will provide Buyer with a copy of such press release or public announcement in advance of its release and provide Buyer with a reasonable opportunity to comment on the same.

Section 7.05    Access to Information.

(a)    From the date hereof until the first anniversary of the Closing and subject to Applicable Law and the Confidentiality Agreement, Sellers shall give to Buyer and its Representatives reasonable access during normal business hours to the offices, properties, books and records of Sellers with respect to the Assets and Assumed Liabilities and to the representatives, internal accounting and finance personnel, officers and senior management of the Sellers (subject to the terms, conditions and restrictions of agreements related to such offices and properties) and furnish Buyer with such reasonably available financial and operating data and other information as Buyer and Buyer's Representatives may from time to time reasonably request; provided that in no event shall Sellers be obligated to provide (i) any information the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound or (ii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons prior to the Bid Deadline in connection with the Transactions or information and analyses relating to such communications. Any investigation pursuant to this Section 7.05(a) shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business by Sellers. The physical access by Buyer and any Person acting on Buyer's behalf, including the investigation described herein (the "Access") shall be at Buyer's sole risk and expense. No information or knowledge obtained in any investigation pursuant to this Section 7.05(a) shall affect or be deemed to modify any representation or warranty made by any Party hereunder. BUYER AGREES TO AND SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS SELLERS AND THEIR AFFILIATES, AND THE OFFICERS, DIRECTORS, EMPLOYEES, INVITEES, AGENTS, REPRESENTATIVES, AND CONTRACTORS OF ANY OF THE FOREGOING (COLLECTIVELY, THE "SELLERS' GROUP") FROM AND AGAINST ANY AND ALL CLAIMS, DEMANDS, ACTIONS, LOSSES, EXPENSES, COSTS (INCLUDING LITIGATION COSTS AND REASONABLE ATTORNEYS' FEES), FINES, PENALTIES, SUITS, AND LIABILITIES OF ANY AND EVERY KIND WHATSOEVER CAUSED BY, ARISING OUT OF OR IN ANY WAY RELATED TO THE ACCESS, INCLUDING INJURY TO OR DEATH OF ANY PERSON AND DAMAGE TO OR LOSS OF ANY REAL OR PERSONAL PROPERTY CAUSED BY, ARISING OUT OF OR IN ANY WAY RELATED TO THE ACCESS. THE FOREGOING RELEASE AND INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH CLAIMS, DEMANDS, ACTIONS, LOSSES, EXPENSES, COSTS, FINES, PENALTIES, SUITS AND LIABILITIES ARISE OUT OF (A) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SINGLE NEGLIGENCE, CONCURRENT NEGLIGENCE, JOINT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE) OF ANY MEMBER OF THE SELLERS' GROUP OR (B) STRICT LIABILITY, STATUTORY LIABILITY, BREACH OF CONTRACT, BREACH OF WARRANTY OR OTHER FAULT OR RESPONSIBILITY OF A MEMBER OF SELLERS' GROUP OR ANY OTHER PERSON OR PARTY."

Case: 22-50515    Doc# 282    Filed: 09/29/22    Entered: 09/29/22 07:38:31    Page 26 of 53

(b)     Buyer agrees that, following the Closing, subject to Applicable Law and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Affiliates to), at the sole cost and expense of Sellers, give to Sellers and their Representatives reasonable access during normal business hours to the offices, books and records relating to Sellers or any of their businesses or operations for any and all periods prior to or including the Closing Date as Sellers and their Representatives may reasonably request and to make copies of the same in connection with (i) the preparation of Tax returns or information returns, (ii) reports or other obligations by Sellers to Governmental Authorities, (iii) with respect to the administration of the Excluded Assets or Excluded Liabilities, (iv) with respect to the administration of the Bankruptcy Case, (v) pursuing, prosecuting, or commencing litigation on account of or relating to Excluded Assets, including Avoidance Actions, (vi) objecting to proofs of claims or administrative expense claims and (vii) any final determination of any audit or examination, Proceeding, or determination. Buyer shall (and shall cause its Subsidiaries to) preserve all such books and records for a period of three years after the Closing; provided, however, that Buyer shall have the right at any time after the second anniversary of the Closing Date to request in writing that Sellers take any such records and, if Sellers do not agree to take such records within 90 Business Days after receipt of the request, Buyer (or its Affiliates, as applicable) may dispose of such records.

Section 7.06    Confidentiality. The Parties acknowledge that Buyer and Sellers previously executed the Confidentiality Agreement. Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail. The Parties acknowledge and understand that this Agreement will be filed with the Bankruptcy Court and may be made available by Sellers to Potential Bidders as contemplated by the Bid Procedures Order. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.06 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by Sellers or their Affiliates in connection with the administration of the Bankruptcy Case, pursuant to any provision of the Bankruptcy Code or any Order of the Bankruptcy Court.

Section 7.07    Solicitation; Other Offers.

(a)     Buyer acknowledges and agrees that from the execution date of this Agreement until the termination of this Agreement in accordance with its terms, Sellers and their respective Affiliates and Representatives shall be permitted to take such actions as permitted under the Bid Procedures Order with respect to an Alternative Transaction and may take any other affirmative action (including entering into any agreement or letter-of-intent with respect thereto) to cause, promote or assist with an Alternative Transaction not otherwise prohibited under the Bid Procedures Order; provided, however, that (i) Sellers and their respective Affiliates may only enter into, and seek the approval of the Bankruptcy Court of, any definitive agreement with respect thereto if such Alternative Transaction is deemed to be a higher or superior offer than the offer contemplated by this Agreement.

(b)     Until the Successful Bidder has been determined in accordance with the Bid Procedures Order, Sellers may, directly or indirectly through Representatives of Sellers, (i) engage in discussions and negotiations regarding an Alternative Transaction with any Potential Bidder

23

and any Potential Bidder's Representatives in accordance with or as otherwise permitted under the Bid Procedures Order in connection with the solicitation of one or more proposals relating to an Alternative Transaction and (ii) furnish to any Potential Bidder who has signed a Confidentiality Agreement in accordance with the Bid Procedures Order and its Representatives that has made a request therefor, public or non-public information relating to any Seller and afford to any such Potential Bidder access to any properties, assets, books or records of any Seller or the business of Sellers; provided that Potential Bidders who have signed a Confidentiality Agreement prior to the date of this Agreement shall not be required to sign another Confidentiality Agreement after the date hereof as a condition to receiving non-public information relating to Sellers.

Section 7.08    Assumption and Rejection of Executory Contracts and Leases.

(a)    Schedule 7.08(a) sets forth a complete list of the executory contracts of Sellers that may be assumed and assigned in accordance with the Bid Procedures Order, together with Sellers' good faith estimate of the Cure Costs that would have to be paid by Buyer to assume each Contract (the "Contract and Cure Schedule").  From the date hereof until immediately prior to the Closing, promptly following any changes to the information set forth on such schedule (including any new Contracts included in the Assets with the consent of Buyer and any change in the Cure Cost of any Contract), Sellers shall provide Buyer with a schedule that updates and corrects the Contract & Cure Schedule.   Buyer may, at any time and from time to time but not later than the Closing include or exclude any Contract from the Contract & Cure Schedule and require Sellers to give notice to the third parties to any such Contract of either (i) Buyer's assumption and assignment thereof (and the amount of Cure Costs associated with such Contract to be paid by Sellers) or (ii) the rejection thereof. Any Contract that has not been rejected by Buyer is an Acquired Contract, and Sellers shall use commercially reasonable efforts to effect the assumption of such Acquired Contract by the applicable Seller in accordance with the Bankruptcy Code and, if Sellers are successful in effecting such assumption as of Closing, such Contract shall be transferred and conveyed to Buyer as an Acquired Contract.  Notwithstanding anything herein to the contrary, Buyer may revise Schedule 7.08(a) by excluding one or more Acquired Contracts at any time prior to one Business Day prior to the commencement of the Closing.

(b)    At or prior to the Closing, (i) the Purchase Price shall be increased by all Cure Costs with respect to the Acquired Contracts paid by Sellers prior to the Closing,  (ii) Buyer (and not Sellers) shall pay all Cure Costs with respect to the Acquired Contracts that have not been paid by Sellers as of the Closing.  At or prior to Closing, Buyer shall provide adequate assurance of future performance of all of the Acquired Contracts so that all of the Acquired Contracts can be assumed by Sellers and assigned to Buyer at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement; provided that Buyer shall cooperate with Sellers in providing such adequate assurance of future performance of all of the Acquired Contracts and Buyer acknowledges that such cooperation may require Buyer to provide information regarding Buyer and its Affiliates, as well as a commitment of performance by Buyer and/or its Affiliates with respect to the Acquired Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Acquired Contracts, and Sellers' obligation to assume and assign such Acquired Contracts is subject to the cooperation and providing of such information and commitment by Buyer.  Sellers shall have no liability for the Cure Costs constituting Assumed Liabilities with respect to the Acquired Contracts.

24

Section 7.09    Employee Matters.

(a)    Pursuant to the Confidentiality Agreement, Buyer is subject to certain restrictions on the solicitation and hiring of the Employees. However, Sellers agree that, (i) beginning on the date hereof Buyer or one of its Affiliates may make offers of employment (whether for full-time employment, part-time employment, or engagement on an independent contractor or temporary services basis) to any or all of the Employees (each such offer, an "Employment Offer"); provided, however, that any such Employment Offer must comply with Section 7.09(b) below, and (ii) if, and only if, the Closing has occurred, Buyer, the Buyer Designee or either of their Affiliate(s) may hire any Employee pursuant to any Employment Offer made in compliance with clause of this Section 7.09(a). Employees who accept such offers of employment are referred to in this Agreement as "Buyer Employees". If, and to the extent that, Buyer's exercise of its rights under this Section 7.09(a) impede or obstruct the ability of the Sellers to comply with their respective obligations under Section 7.02, such non-compliance by any Seller should not be, nor shall it be deemed to be, a breach of this Agreement by such Seller.

(b)    Each Employment Offer shall be subject to and conditioned upon the occurrence of the Closing and shall only become effective as of the date of the applicable Employee's commencement of employment with Buyer or its applicable Affiliate.

(c)    Sellers shall reasonably assist Buyer and its Affiliates, as reasonably requested by Buyer or any such Affiliate, in communicating with the Employees regarding potential employment with Buyer or its Affiliates.

(d)    Buyer acknowledges that, except for solicitations expressly permitted by Section 7.09(a)(i) and hiring expressly permitted by Section 7.09(a)(ii), Buyer remains subject to the restrictions on the solicitation of the Employees contained in the Confidentiality Agreement; provided that if the Closing occurs, such provision of the Confidentiality Agreement shall cease to apply to Buyer or the Buyer Designee seven days after the Closing Date.

(e)    As of the date of the applicable Employee's commencement of employment with Buyer, Buyer Designee or their applicable Affiliate, the applicable Buyer Employee will cease participation in any of the Company Benefit Plans that such Buyer Employees participated in immediately prior to the Closing Date.

(f)    In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the Closing Date, Buyer will assume all liability for providing and administering all required notices and benefits under COBRA to all Employees (including Buyer Employees and Employees who do not become Buyer Employees) and associated COBRA beneficiaries, and Sellers shall provide to Buyer sufficient information to enable Buyer to carry out such obligations. Sellers will have no COBRA liability or obligations to such current and former Employees or associated COBRA beneficiaries after the Closing Date, except with respect to any violations of law that occurred prior to the Closing Date.

(g)    With respect to the Employees, Sellers will have full responsibility under the WARN Act and any similar legislation for any acts or omissions caused by any action of Sellers

25

before the Closing Date, and Buyer will have full responsibility under the WARN Act for any acts or omissions caused by any action of Buyer on or after the Closing Date.

Section 7.10    Cooperation With Respect to Tax Matters.

(a)    Solely to the extent not exempt in accordance with Section 1146 of the Bankruptcy Code, Seller shall pay and shall be responsible for all Transfer Taxes (and related costs, fees, and expenses) imposed on or payable in connection with the Transactions.

(b)    All real property, personal property and other ad valorem Taxes with respect to the Assets that are accrued prior to the Closing and become due after the Closing Date shall be paid by Sellers. All real property, personal property, other ad valorem Taxes, and sales and use Taxes with respect to the Assets that are accrued and due after the Closing Date, including any sales and use Taxes that are accrued and due on or after the Closing Date and are related to any of the Buyer Stores, shall be paid by Buyer.  All real property, personal property, other ad valorem Taxes, and sales and use Taxes levied with respect to the Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date, shall be prorated between the Sellers and Buyer as of 11:59 p.m. (Pacific time) on the Closing Date. If the exact amount of any real property, personal property, other ad valorem Taxes, and sales and use Taxes is not known on the Closing Date, the apportionment shall be based upon a reasonable amount, without subsequent adjustment (such amount, the "Tax Reimbursement"). Each Party shall be responsible for preparing and filing all Tax Returns with respect to the Taxes payable by such Party.  Buyer and Sellers agree to use the alternative procedure with respect to wage reporting described in Section 5 of Revenue Procedure 2004-53.

(c)    Sellers and Buyer shall cooperate with each other and provide each other with such assistance as reasonably may be requested by either of them in connection with the preparation of any Tax Return or any audit or other examination by any taxing authority, or any judicial or administrative Proceedings relating to any liability for Taxes under this Agreement. If Buyer requests assistance hereunder Buyer shall reimburse Sellers for all reasonable expenses incurred in providing such assistance. Nothing in this Section 7.10 shall require Buyer to be liable for any of the income Tax liability of Sellers.

(d)    Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the Transactions.

Section 7.11    Certain Tax Matters. If a Party determines, based on advice from outside Tax counsel, that amending or otherwise modifying the provisions of this Agreement would result in a material Tax benefit or a material reduction of adverse Tax consequences for such Party without having an adverse Tax or adverse economic impact on any other Party, such Party may propose such amendments or modifications to the other Party by providing written notice containing the text of the proposed amendments or modifications and, upon the request of a Party, a reasonably detailed Tax analysis of their impact on all of the Parties. Each of the Parties agrees, for a period of 20 days after the date of such notice, to negotiate in good faith amendments or modifications to this Agreement to achieve the Tax benefits, or reduce the adverse Tax consequences, as outlined in such notice; provided that no Party shall be obligated to agree to any amendment or modification that such Party determines, in its own judgment after consulting with

26

its Tax advisors, would have an adverse Tax impact, adverse economic impact, or other adverse impact on such Party and, provided, further, that the foregoing covenant to negotiate in good faith shall not relieve any Party of its other obligations contained in this Agreement nor shall it be construed as a waiver of the performance by any other Party hereunder.

Section 7.12    Casualty Loss. Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, any portion of the Assets or the Business is (a) condemned or taken by eminent domain or (b) damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, and (i) in the case of condemnation or taking, Sellers shall assign or pay, as the case may be, any proceeds any Seller has received thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Sellers shall, at Sellers' option, either repair such damage or assign the insurance proceeds therefrom to Buyer at Closing. To the extent such proceeds have not been committed or applied by Sellers in accordance with this Section 7.12, Sellers shall transfer to Buyer, at Closing, all proceeds received by Sellers (net of costs incurred by Sellers in collection thereof), as well as all of the right, title, and interest of Sellers in and to any unpaid insurance or condemnation proceeds arising out of such loss, damage, destruction, or taking. Any such funds that have been committed by Sellers for repair, restoration, or replacement as aforesaid shall be paid by Sellers for such purposes or, at Sellers' option, delivered to Buyer upon Sellers' receipt from Buyer of adequate assurance and indemnity that Sellers shall incur no liability or expense as a result of such commitment. Notwithstanding anything to the contrary in this Agreement, all Assets that have suffered a casualty loss described in this Section 7.12 shall be included in the Closing and Buyer shall pay the full Purchase Price therefor, and Buyer's recourse with respect to any such casualty loss shall be limited to the proceeds of Sellers' applicable insurance coverage actually recovered by Sellers in respect thereof or other sums paid to Sellers by third parties (or an assignment of claims related thereto), which proceeds or other sums shall be payable to Buyer only upon or after the Closing. Sellers shall have no other liability or responsibility to Buyer with respect to a casualty loss, EVEN IF SUCH CASUALTY LOSS SHALL HAVE RESULTED FROM OR SHALL HAVE ARISEN OUT OF THE SOLE OR CONCURRENT NEGLIGENCE, FAULT, VIOLATION OF AN APPLICABLE LAW, OR WILLFUL MISCONDUCT OF ANY SELLER.

Section 7.13    Release of Intellectual Property Liens. Sellers and Buyer shall cooperate with each other and provide each other with such assistance as may be required to obtain a release of the Liens identified on Schedule 5.10(b) hereto prior to the Closing Date.

Section 7.14    Transfer of Acquired Assets; Post-Closing Operation.

(a)    From and after the Closing Date, Sellers shall provide or cause to be provided to Buyer and Buyer Designees full and complete access to the Assets, and Seller shall cooperate with all necessary arrangements for Buyer or a Buyer Designee to take possession of the Assets, and, at Buyer's expense, transfer same to a location operated by Buyer or a Buyer Designee, to the extent necessary, as promptly as practicable following the Closing.

(c)    The Sale Order shall provide for the modification of the caption in the proceedings before the Bankruptcy Court to reflect the change in the name of the Sellers, except that during the pendency of the Bankruptcy Case, the Sellers shall be permitted to use the name "StorCentric", "Drobo", "Nexsan Technologies", "VS Acquisition", "Connected Data" and

27

"Retrospect", in connection with matters relating to the Bankruptcy Case and as former names for legal and noticing purposes, but for no other commercial purpose. Except as provided in the immediately preceding sentence, upon the Closing, any and all right of the Sellers and their Affiliates to the use of the Intellectual Property, including the names "StorCentric", "Drobo", "Nexsan Technologies", "VS Acquisition", "Connected Data" and "Retrospect" shall terminate, and within five (5) Business Days after the Closing, the Sellers and their Affiliates shall file with the applicable Governmental Authorities all documents reasonably necessary to delete from their names the words "StorCentric", "Drobo", "Nexsan Technologies", "VS Acquisition", "Connected Data" and "Retrospect", or any derivatives thereof and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.

(d)    As of the Closing Date, each Seller hereby (i) authorizes Buyer or any Buyer Designee to open any and all mail addressed to any Seller relating to the Business or the Assets (and not to the Excluded Assets) and delivered to the offices of the Business or otherwise to Buyer or any Buyer Designee if received on or after the Closing Date and (ii) appoints Buyer, any Buyer Designee or its attorney-in-fact to endorse, cash and deposit any monies, checks or negotiable instruments received by Buyer of any Buyer Designee after the Closing Date with respect to Accounts Receivable that are Assets or accounts receivable relating to work performed by Buyer after the Closing, as the case may be, made payable or endorsed to any Seller or any Seller's order, for Buyer's or any Buyer Designee's own account. As of the Closing Date, Buyer or any Buyer Designee shall have the sole authority to bill and collect Accounts Receivable that are Assets and accounts receivable relating to work performed by Buyer or any Buyer Designee after the Closing.

## ARTICLE 8
## CONDITIONS TO OBLIGATIONS OF PARTIES

Section 8.01    Conditions to Obligations of Buyer and Sellers. The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction (or, in the case of clauses (b) and (c) of this Section 8.01, waiver by each to the extent permitted under Applicable Law) of each of the following conditions:

(a)    no Applicable Law or Order shall prohibit the Transactions or the consummation of the Closing;

(b)    all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained (other than actions or filings with any Governmental Authority required to be obtained at Closing);

(c)    no Proceeding instituted by any Governmental Authority shall be pending and no Order of any Governmental Authority of competent jurisdiction shall be in effect, in each case which seeks to or does, as applicable, prohibit, restrain or enjoin the consummation of the Transactions; provided that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to cause such Proceeding to have been dismissed or resolved in favor of the Parties or to prevent the entry of such Order;

28

(d)      (i) the Bid Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court, (ii) no order staying, reversing, modifying, or amending such orders shall be in effect on the Closing Date, (iii) the Sale Order shall not be subject to any challenge of Buyer's good faith under section 363(m) of the Bankruptcy Code, and (iv) each such order shall be in full force and effect; and

(e)      the assets identified on Schedule 8.01(g) shall have been transferred to Sellers by bill of sale or other equivalent transfer document; and

(f)      the Bankruptcy Case shall not have been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

Section 8.02   Conditions to Obligations of Sellers. The obligation of Sellers to consummate the Transactions are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Sellers):

(a)      *Representations and Warranties*. Each representation and warranty of Buyer contained herein shall have been true and correct as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are expressly made as of a different date, in which case such representations and warranties shall have been so true and correct as of such other date), except in each case, for such failures of representations and warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations and warranties) which would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Sellers to consummate the transactions contemplated hereby); provided that the representations and warranties of Buyer contained in Sections 6.01 and 6.02(a)(i) shall be true and correct in all respects, and Buyer shall have delivered to Sellers a certificate, executed by an executive officer of Buyer, to such effect.

(b)      *Performance*. Buyer shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed or complied with by Buyer at or prior to the Closing Date, and Buyer shall have delivered to Sellers a certificate, executed by an executive officer of Buyer, to such effect.

(c)      *Closing Documents*. On or prior to the Closing Date, Buyer shall have delivered to Sellers each of the documents listed in Section 4.02(a) hereof.

(d)      *Payment of Purchase Price*. In full satisfaction of Buyer's obligation to pay the Purchase Price, at the Closing Sellers' obligations under the DIP Loan to repay the Serene Debt on the Closing Date shall be satisfied and deemed paid in full.

Section 8.03   Conditions to Obligations of Buyer. The obligations of Buyer to consummate the Transactions are subject to the fulfillment at or prior to the Closing Date of each of the following conditions (any or all of which may be waived in whole or in part by Buyer).

(a)      *Representations and Warranties*. Each representation and warranty of Sellers contained herein shall have been true and correct as of the date hereof and as of the Closing Date, as if made on the Closing Date (unless, in each case, such representations and warranties are

29

expressly made as of a different date, in which case such representations and warranties shall have been so true and correct as of such other date), except in each case, for such failures of representations and warranties to be true and correct (without giving effect to any materiality qualification or standard contained in any such representations and warranties) which would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the ability of Buyer to consummate the transactions contemplated hereby); provided that the representations and warranties of Sellers contained in Sections 5.01(a) and (b), and Section 5.02(a)(i)(A) shall be true and correct in all respects, and Sellers shall have delivered to Buyer one or more certificates, executed by an executive officer of each Seller, to such effect.

(b)     *Performance*. Sellers shall have performed and complied, in all material respects, with all agreements, obligations and covenants required by this Agreement to be so performed and complied with by Sellers at or prior to the Closing, and Sellers shall have delivered to Buyer one or more certificates, executed by an executive officer of each Seller, to such effect.

(c)     *Closing Documents*. On the Closing Date, Sellers shall have executed, as applicable, and delivered to Buyer each of the documents listed in Section 4.02(b) hereof.

(d)     *Consents*.   The Sellers shall have received and delivered to Buyer written consents, in form and substance, and on terms, satisfactory to Buyer, necessary to assign to Buyer and/or one or more Buyer Designees the Acquired Contracts to the extent the Sale Order is ineffective do so to the extent that failure to obtain such consents would have a Material Adverse Effect.

## ARTICLE 9
## TERMINATION

Section 9.01    Grounds for Termination. Subject to the penultimate sentence of this Article 9, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)     by mutual written agreement of Sellers and Buyer;

(b)     by either Sellers or Buyer if the Closing shall not have been consummated on or before September 30, 2022 (the "End Date"), unless extended by mutual written agreement of all of the Parties;

(c)     by either Sellers or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any non-appealable Final Order of any Governmental Authority having competent jurisdiction;

(d)     by either Sellers or Buyer if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement;

(e)     by Buyer if:

30

(i)     the Sale Order shall not have been entered on or before September 30, 2022 (subject to the proviso below); provided that at the time of such termination, Buyer is not then in material breach of its obligations contained in this Agreement;

(ii)     Buyer is not designated as the Successful Bidder at the conclusion of the Auction;

(iii)     the Bankruptcy Court shall have approved any Alternative Transaction or the Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(iv)     Sellers shall have breached any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements, contained in this Agreement such that the condition set forth in Section 8.02(a) or (b) shall not be satisfied; or

(v)     any condition set forth in Section 8.01 or Section 8.02 shall have become incapable of being satisfied by the End Date;

provided that the deadline set forth in clause (i) of this Section 9.01(e) shall be subject to the Bankruptcy Court's docket, and accordingly, (A) shall be deemed extended through the date of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (B) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, Sellers are unable to conclude such hearing(s) prior to such deadline and (C) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (A) and (B), cannot be complied with prior to such deadline;

(f)     by Sellers if:

(i)     Buyer shall have breached any of its representations or warranties or failed to perform or comply with any of its covenants or agreements contained in this Agreement such that any of the conditions set forth in Section 8.03 shall not be satisfied, and Sellers shall have given at least 10 days' written notice to Buyer to cure such breaches and failures but such condition remains unsatisfied;

(ii)     any condition set forth in Section 8.01 or Section 8.03 shall have become incapable of being satisfied by the End Date; or

31

Notwithstanding the foregoing, (A) Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (I) the condition to closing set forth in Section 8.02(a) or (b) shall not be satisfied or (II) such breach or failure to perform or comply by Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred, and (B) Buyer shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyer is in breach of its representations and warranties or shall have failed to perform or comply with any of its covenants and agreements such that either the condition to closing set forth in Section 8.03(a) or (b) shall not be satisfied or such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred. The Party desiring to terminate this Agreement pursuant to this Section 9.01 (other than pursuant to Section 9.01(a)) shall give written notice of such termination to the other Party.

Section 9.02    Procedure upon Termination.    In the event of the termination of this Agreement, written notice thereof shall forthwith be given by the party or parties so terminating to the other Party or Parties, and this Agreement shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by Sellers or Buyer except that the provisions of this Section 9.02 and Sections 7.04, 11.01, 11.03, 11.05, 11.06, 11.07, 11.08, 11.09, 11.10, 11.11 and 11.12 hereof shall survive any termination of this Agreement and nothing contained in this Agreement shall relieve any Party from liability for any breach or inaccuracy of its representations, warranties, covenants or agreements contained in this Agreement prior to such termination.

Section 9.03    Effect of Termination. If this Agreement is terminated as permitted by Section 9.01, such termination shall be without liability of either Party (or any owner or Representative of such Party) to the other Party to this Agreement, except as provided in this Section 9.03; provided that if such termination shall result from any breach by either Party of any of its representations or warranties or failure to perform or comply with any of its covenants or agreements contained in this Agreement, such Party shall be fully liable for any and all liabilities and damages incurred or suffered by the other Party as a result of such failure. The provisions of this Article 9 shall survive any termination hereof pursuant to Section 9.01.

## ARTICLE 10
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

Section 10.01 Survival of Representations and Warranties. The representations and warranties of Sellers or Buyer contained herein and in any certificate or other writing delivered by Sellers or Buyer, as applicable, pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability on behalf of any of Sellers or their respective lenders or creditors thereafter or Buyer or its Affiliates in respect thereof. Each of the covenants of Sellers and Buyer contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (a) completion of the performance of such covenant in accordance with this Agreement or, (b)(i) if time for performance of such covenant is specified in this Agreement,

32

60 days following the expiration of the time period for such performance or (ii) if time for performance of such covenant is not specified in this Agreement, the expiration of the applicable statute of limitations with respect to any claim for any failure to perform such covenant; provided that if a written notice of any claim with respect to any covenant to be performed after Closing is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

## ARTICLE 11
## MISCELLANEOUS

Section 11.01 Notices. All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Buyer, to:

Serene Investment Management, LLC
2148 Jimmy Durante Blvd., Suite B
Del Mar, California 92014
Attn: Adam J. Phillips
Email: adam@sereneim.com

with a copy to:

Loeb & Loeb LLP
10100 Santa Monica Boulevard, Suite 2200
Los Angeles, California 90067
Attn: Lance Jurich, Esq.
Email: ljurich@loeb.com

if to Sellers, to:

[_____]

with a copy to:

[_____]

or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 11.02 Amendments and Waivers.

(a)     Any provision of this Agreement may be amended or waived prior to the Closing if but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 11.03  Expenses. Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 11.04  Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns; provided that neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto; provided, however, that Sellers may assign their respective rights and obligations under this Agreement to any liquidating trust or other representative of Sellers created or appointed pursuant to a Bankruptcy Court Order; and provided, further, that Buyer may assign its rights and obligations under this Agreement to an Affiliate, in whole or from time to time in part; provided that no such transfer or assignment will release Buyer of its obligations hereunder or enlarge, alter or change any obligation of any Seller to Buyer.

Section 11.05  Governing Law. EXCEPT TO THE EXTENT PROVISIONS OF THE BANKRUPTCY CODE OVERRIDE THIS SECTION, THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, AND ANY OTHER DOCUMENT OR INSTRUMENT DELIVERED PURSUANT HERETO, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

Section 11.06  Jurisdiction. Each Party agrees that it shall bring any action or Proceeding in respect of any claim arising out of or related to this Agreement (whether in contract or tort) or the transactions contained in or contemplated by this Agreement and the Ancillary Agreements, exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Case remains open and (b) after the close of the Bankruptcy Case or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for Northern District for California or any California State court sitting in Sunnyvale, California (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or Proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts

34

are an inconvenient forum or do not have jurisdiction over any Party and (iv) agrees that service of process upon such Party in any such action or Proceeding shall be effective if notice is given in accordance with <u>Section 11.01</u>.

Section 11.07 <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

Section 11.08 <u>Counterparts; Effectiveness; Third Party Beneficiaries</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by all of the other Parties. Until and unless each Party has received a counterpart hereof signed by the other Parties, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). This Agreement may be in the form of an Electronic Record (as defined in 15 USC § 7006, as amended from time to time) and may be executed using Electronic Signatures (as defined in 15 USC § 7006, as amended from time to time), including, without limitation, facsimile and .pdf, and, if in such form or so executed, shall be considered an original, and shall have the same legal effect, validity and enforceability as a paper record. For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance of a manually signed signature page to this Amendment which has been converted into electronic form (such as scanned into PDF format), or an electronically signed signature page to this Agreement converted into another format, for transmission, delivery and/or retention. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns prior to Closing.

Section 11.09 <u>Entire Agreement</u>. This Agreement, the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 11.10 <u>Severability</u>. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 11.11 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (without posting any bond or other undertaking) or to enforce specifically the performance of the terms and provisions hereof in addition to any other remedy to which they are entitled at law or in equity.

Case: 22-50515   Doc# 282   Filed: 09/29/22   Entered: 09/29/22 07:38:31   Page 39 of 53

Section 11.12 <u>Certain Acknowledgements and Limitations</u>.

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.

(b) Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(c) EACH OF BUYER AND SELLERS AGREE THAT, (I) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE 5</u> OF THIS AGREEMENT, NEITHER SELLERS NOR ANY OF THEIR AFFILIATES OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO BUYER OR TO ANY OF ITS REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, AND (II) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE 6</u> OF THIS AGREEMENT, NEITHER BUYER NOR ANY OF ITS AFFILIATES OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO SELLERS OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND. NO PERSON HAS BEEN AUTHORIZED BY SELLERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO SELLERS OR THEIR BUSINESS OR OPERATIONS OR THE ASSETS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON. NO PERSON HAS BEEN AUTHORIZED BY BUYER TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO BUYER OR ITS BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(d) UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY EXEMPLARY, PUNITIVE, CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR INDIRECT DAMAGES OR LIABILITIES ARISING OUT OF ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT OR UNDER ANY THEORY OF LAW, INCLUDING, WITHOUT LIMITATION, ANY LOSS OF PRODUCTION, LOSS OF PROFIT OR ANTICIPATED PROFIT, LOSS OF BUSINESS REPUTATION, LOSS OPPORTUNITY, BUSINESS INTERRUPTION OR OTHER CONSEQUENCES.

Section 11.13 <u>Disclosure Schedules</u>. All references to Schedules and Disclosure Schedules in <u>Article 5</u> of this Agreement refer to Schedules contained in the Disclosure Schedule.

36

The information in the Disclosure Schedule constitutes exceptions, qualifications and/or supplements to particular representations or warranties of Sellers as set forth in this Agreement. The Disclosure Schedule shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the Ordinary Course of Business of, or required to be disclosed by, Sellers or constitutes a Material Adverse Effect. Capitalized terms used in the Disclosure Schedule that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Disclosure Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement. The statements in each Schedule of the Disclosure Schedule qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedule is reasonably apparent.

Section 11.14 <u>Liquidating Trustee</u>. If at any time any one or more of Sellers liquidates or otherwise has a trustee or other representative appointed by the Bankruptcy Court, then such trustee or other representative shall be entitled to exercise the rights of the applicable Seller(s) under the Agreement.

Section 11.15 <u>Sellers' Representative</u>. Sellers, jointly and severally, hereby represent and warrant that the statements in this <u>Sections 11.15</u> and <u>11.16</u> are correct and complete as of the date of this Agreement:

(a)     John Coughlan ("<u>Coughlan</u>") has been appointed, and is authorized, and empowered to act, subject to the approval of the Bankruptcy Court as necessary and required by Applicable Law, in connection with, and to facilitate the consummation of, the Transactions and in connection with any activities to be performed by Sellers under this Agreement and the other Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)     to receive and apply the Purchase Price or any other amount paid in connection with this Agreement or the other Transaction Documents on behalf of Sellers;

(ii)     to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the other Transaction Documents (including in connection with any claims related to the Transactions) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the other Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as Coughlan will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller(s) with respect to any such action, (C) file any

37

proofs, debts, claims and petitions as Coughlan may deem advisable or necessary, (D) settle or compromise any claims related to the Transactions, (E) assume, on each Sellers behalf, the defense of any claims related to the Transactions, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iii) to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of Coughlan arising out of or under or in any manner relating to this Agreement or the other Transaction Documents;

(iv) to take any action to be taken by one or more Sellers under or in connection with this Agreement or any other Transaction Document; or

(v) to make, execute, acknowledge and deliver all such other Contracts, guarantees, Orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, amendments and waivers as described in Section 11.02 and, in general, to do any and all things and to take any and all action that [Coughlan ], in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the activities described Section 11.15(a)(i) through Section 11.15(a)(iii) above and the Transactions.

(b)     Coughlan's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by Coughlan acting by signing as the representative of any Seller.

Section 11.16  Reliance. Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of Coughlan as the action of each Seller (and may ignore any action taken or notice given by any Seller other than Coughlan) in all matters relating to this Agreement, the other Transaction Documents or the Transactions. Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, Coughlan shall be deemed to have been delivered to, or taken with respect to, all Sellers. Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to Coughlan. Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

Section 11.17  Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

[Signature Page Follows]

39

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

SELLERS:

STORCENTRIC, INC.

By:_____
Name:
Title:

DROBO INC.

By:_____
Name:
Title:

NEXSAN CORPORATION

By:_____
Name:
Title:

NEXSAN TECHNOLOGIES INCORPORATED

By:_____
Name:
Title:

VS ACQUISITION COMPANY, LLC

By:_____
Name:
Title:

{BH291990.1}

S-1

22785011.3

CONNECTED DATA, INC.


By:_____
Name:
Title:


RETROSPECT, INC.


By:_____
Name:
Title:


BUYER:

    SERENE INVESTMENT MANAGEMENT, LLC,


By:_____

Name:

Title:

Case: 22-50515   Doc# 282   Filed: 09/29/22   Entered: 09/29/22 07:38:31   Page 45 of
53

**ANNEX A**

**RESERVED**

A-3

22785011.3

**ANNEX B**

**DEFINITIONS**

"Accounts Receivable" shall have the meaning ascribed to it in Section 2.01(a)(iv) hereof.

"Acquired Contracts" shall have the meaning ascribed to it in Section 2.01(a)(vi), as modified by Section 7.08(b) hereof.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning ascribed to it in the first paragraph of this agreement.

"Allocation Statement" shall have the meaning ascribed to it in Section 3.03 hereof.

"Allowed" shall mean, with respect to any Claim, such Claim or portion thereof: (a) as to which no objection or request for estimation has been filed, no litigation has commenced, and Buyer otherwise has assented to the validity of such Claim; (b) as to which any objection or request for estimation that has been filed has been settled, waived, withdrawn or denied by Final Order; or (c) that is allowed by (i) a Final Order or (ii) an agreement between the holder of such Claim and Buyer.

"Alternative Transaction" means, other than the Transactions or any sales of Inventory effected in the Ordinary Course of Business, any sale, transfer or other disposition, directly or indirectly, of the Assets.

"Applicable Law" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, or Order adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Assets" shall have the meaning ascribed to it in Section 2.01(a) hereof.

"Assignment and Assumption Agreement" shall have the meaning ascribed to it in Section 4.02(a)(ii).

"Assumed Liabilities" shall have the meaning ascribed to it in Section 2.01(c) hereof.

"Avoidance Actions" shall mean any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code against any person or entity.

"Bankruptcy Case" shall have the meaning set forth in the recitals hereof.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101 et seq., as amended.

22785011.3

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of California or any other court having jurisdiction over the Bankruptcy Case from time to time.

"Bid Deadline" shall have the meaning set forth in the Bid Procedures Order.

"Bid Procedures" means the Bid Procedures, substantially in the form attached as Exhibit 1 to the Bid Procedures Order, with such changes, if any, as shall be reasonably acceptable in form and substance to Buyer and Sellers.

"Bid Procedures Order" means an order of the Bankruptcy Court, substantially in the form attached hereto as Exhibit D, with such changes, if any, as shall be reasonably acceptable in form and substance to Buyer and Sellers.

"Bill of Sale" shall have the meaning ascribed to it in Section 4.02(b)(ii).

"Books and Records" shall have the meaning ascribed to it in Section 2.01(a)(viii) hereof.

"Business" shall have the meaning set forth in the recitals hereof.

"Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as referenced in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in California.

"Buyer" shall have the meaning ascribed to it in the first paragraph of this Agreement.

"Buyer Designee" means one or more Affiliates of Buyer designated by Buyer in writing to Seller prior to the Closing.

"Buyer Employees" shall have the meaning set forth in Section 7.09(a).

"Buyer's Knowledge" means the actual knowledge of the executive officers of Buyer.

"Chosen Courts" shall have the meaning ascribed to it in Section 11.06 hereof.

"Claim" means a claim against any of Sellers as defined in Bankruptcy Code § 101(5).

"Closing" shall have the meaning ascribed to it in Section 4.01 hereof.

"Closing Date" shall have the meaning ascribed to it in Section 4.01 hereof.

"Closing Date Cash Consideration" shall have the meaning ascribed to it in Section 3.02 hereof.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"Code" means the Internal Revenue Code, 26 U.S.C. §§ 1 et seq.

"Company Benefit Plan" shall have the meaning set forth in Section 5.08(a).

22785011.3
Case: 22-50515    Doc# 282    Filed: 09/29/22    Entered: 09/29/22 07:38:31    Page 48 of 53

"Contract" means any contract, agreement, lease, license, indenture, note, bond, sale and purchase order, instrument or other commitment, whether oral or written (including any amendments or modifications thereto).

"Confidentiality Agreement" means the Confidentiality Agreement by Buyer or its Affiliate in favor of the Debtors.

"Contract and Cure Schedule" shall have the meaning ascribed to it in Section 7.08(a) hereof.

"Cure" shall mean the payment or satisfaction of all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Acquired Contracts at the time of the assumption and assignment thereof, and all non-monetary defaults that must be cured at the time of the assumption thereof and assignment under the Acquired Contracts, each as determined by the Bankruptcy Court.

"Cure Costs" means, with respect to any Acquired Contract, any and all amounts necessary to Cure all defaults, if any, to pay all losses that have resulted from defaults under such Acquired Contract, and to pay any amounts required under the terms of an Acquired Contract in connection with the transfer or assignment thereof.

"DIP Loan" the post-petition debtor-in-possession financing provided by Buyer to Sellers pursuant to the DIP Order.

"DIP Order" means that certain FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL; (III) GRANTING PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF entered in the Bankruptcy Case on July 29, 2022 [Docket No. 59], as amended from time to time.

"Disclosure Schedule" means the letter dated the date hereof, executed by Sellers and delivered to Buyer on the date hereof in connection with the execution and delivery of this Agreement, which letter is identified therein as the Disclosure Schedule for purposes of this Agreement.

"Employees" shall have the meaning set forth in Section 5.08(a).

"Employment Offer" shall have the meaning ascribed to it in Section 7.09(a) hereof.

"End Date" shall have the meaning set forth in Section 9.01(b) hereof.

"Equipment" shall have the meaning ascribed to it in Section 2.01(a)(ii) hereof.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall have the meaning set forth in Section 5.08(a).

"Excluded Assets" shall have the meaning ascribed to it in Section 2.01(b) hereof.

"Excluded Liabilities" shall have the meaning ascribed to it in Section 2.01(d) hereof.

"Final Order" means an Order of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by Applicable Law.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, agency or official, including any political subdivision thereof, or any tribal authority.

"Intellectual Property" shall have the meaning ascribed to it in Section 2.01(a)(v) hereof.

"Intellectual Property Assignment Agreement" shall have the meaning ascribed to it in Section 4.02(a)(iii).

"Inventory" shall have the meaning ascribed to it in Section 2.01(a)(iii) hereof.

"IRS" shall have the meaning ascribed to it in Section 3.03 hereof.

"Lien" means, with respect to any property or asset, any lease, license, hypothecation, mortgage, lien, interest pledge, charge, security interest, option, right of use, first offer or first refusal, easement, servitude, setoff, recoupment, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, adverse claims (including consumer claims for product liability), restrictive covenant, and other restrictions or interests of any kind, whenever granted and including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37) and all "interests" as that term is used in Bankruptcy Code § 363(f).

"Material Adverse Effect" means any change, effect, occurrence, development, circumstance or state of facts, which (a) has a material adverse effect on the business, properties, assets, operations, financial condition or results of operations of the Business, or (b) would materially impair Sellers' ability to perform their obligations under this Agreement.

"Offer Date" shall have the meaning ascribed to it in Section 8.03(f) hereof.

"Ordinary Course of Business" means the ordinary course of business of Sellers, consistent in all material respects with past custom and practice of Sellers. Without limiting the effect of the foregoing, the term "Ordinary Course of Business" as used herein shall be no broader than the term "Ordinary Course of Business" as used in Section 363 of the Bankruptcy Code.

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar

22785011.3
Case: 22-50515    Doc# 282    Filed: 09/29/22    Entered: 09/29/22 07:38:31    Page 50 of 53

determination or finding by, before, or under the supervision of any governmental body, or any arbitrator, mediator, or other quasi-judicial or judicially sanctioned Person or body.

"Organizational Documents" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"Parties" shall mean Buyer and Sellers.

"Party" shall mean Buyer, on the one hand, or Sellers, on the other hand.

"Permits" shall have the meaning ascribed to it in Section 2.01(a)(ix).

"Permitted Liens" means (i) Liens for Taxes or other governmental fees not yet due and payable, (ii) immaterial statutory Mechanic's, materialmen's, carrier's, supplier's, vendor's, repairer's or other similar statutory Liens arising in the Ordinary Course of Business securing amounts that are not delinquent, and (iii) Liens created by Buyer or any of their respective successors or assigns.

"Person" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"Petition Date" shall have the meaning set forth in the recitals hereof.

"Post-Closing Permitted Liens" means, in the case of any Seller, any Liens described in the definition of Permitted Liens solely to the extent such Liens secure Assumed Liabilities, but excluding any Liens that secure claims from which the Assets are released as of Closing pursuant to the Sale Order.

"Potential Bidders" shall have the meaning set forth in the Bid Procedures Order.

"Proceeding" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"Purchase Price" shall have the meaning ascribed to it in Section 3.02 hereof.

"Representatives" means, with respect to any Person, the officers, directors, Employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"Sale Hearing" shall have the meaning set forth in the Bid Procedures Order.

22785011.3

"<u>Sale Order</u>" means an Order(s) of the Bankruptcy Court in the form and substance acceptable to Buyer and Sellers, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions.

"<u>Schedule of Assets and Liabilities</u>" means the Schedule of Assets and Liabilities filed on July 20, 2022 with the Bankruptcy Court in connection with the Bankruptcy Case.

"<u>Seller Financial Statements</u>" shall have the meaning ascribed to it in Section 5.12.

"<u>Sellers</u>" shall have the meaning ascribed to it in the first paragraph of this Agreement.

"<u>Sellers' Knowledge</u>" means the actual knowledge of the managers, directors and officers of each Seller, after due inquiry.

"<u>Serene Debt</u>" means the amount due and owing under the DIP Loan on the Closing Date.

"<u>Subsidiary</u>" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"<u>Successful Bidder</u>" shall have the meaning ascribed to the term "Winning Bidder" set forth in the Bid Procedures Order.

"<u>Taxes</u>" shall mean all taxes, charges, fees, levies, penalties or other assessments imposed by any United States federal, state, local or foreign taxing authority, including, but not limited to, income, gross receipts, license, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), custom duty, capital stock or other equity, excise, real property, personal property, water and sewer charges, municipal utility district, ad valorem, sales, use, transfer, franchise, payroll, employment, withholding, severance, social security or other tax of any kind whatsoever, including any interest, penalties or additions attributable thereto, whether disputed or not.

"<u>Tax Return</u>" shall mean any return, declaration, report, claim for refund, information return or other document (including any related or supporting information) required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Technology</u>" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes, proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in,

22785011.3
Case: 22-50515    Doc# 282    Filed: 09/29/22    Entered: 09/29/22 07:38:31    Page 52 of 53

incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Transaction Documents" means the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Bill of Sale, and all agreements, documents and instruments entered into by Buyer, on the one hand, and a Seller, on the other hand, as of or after the date hereof and at or prior to Closing in connection with the Transactions (as each such document, agreement and instrument may be amended, supplemented or modified).

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of Assets for the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement and the other Transaction Documents.

"Transfer Taxes" means any transfer, documentary, excise, sales, use, real property transfer or recording, gains, value-added, stamp, registration and other Taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties and interest in respect thereof) attributable to the sale or transfer of the Acquired Assets, but excluding any taxes imposed on or measured by income or gross receipts.

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

22785011.3